Barry I. Levy (BL 2190)
Michael A. Sirignano (MS 5263)
Ryan Goldberg (RG 7570)
RIVKIN RADLER LLP
926 RXR Plaza
Uniondale, New York 11556
(516) 357-3000

*Counsel for Plaintiffs, Government Employees Insurance
Co., GEICO Indemnity Co., GEICO General Insurance
Company and GEICO Casualty Co.*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

GOVERNMENT EMPLOYEES INSURANCE  CO.,
GEICO INDEMNITY CO., GEICO GENERAL
INSURANCE COMPANY and GEICO CASUALTY
CO.,

Docket No.:_____ (      )

Plaintiff,

-against-

**Plaintiff Demands a
Trial by Jury**

GRACIA MAYARD,
AHAVA MEDICAL, P.C.,
ALLMED MEDICAL OF WILLIAMSBURG, P.C.,
NAM HU NAM, M.D.,
ESSENTIAL MEDICAL CARE, P.C.,
LIFESPAN MEDICAL, P.C.
BILLY GERIS, M.D.,
JAMAICA MEDICAL PLAZA, P.C.,
PAVEL YUTSIS, M.D.,
LIFEX MEDICAL CARE, P.C.,
YVETTE DAVIDOV, D.O., AND
S&R MEDICAL, P.C.

Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

## COMPLAINT

Plaintiffs Government Employees Insurance Co., GEICO Indemnity Co., GEICO General

Insurance Company and GEICO Casualty Co. (collectively "GEICO" or "Plaintiffs"), as and for

their Complaint against the Defendants, hereby allege as follows:

## NATURE OF THE ACTION

1.     This action seeks to recover more than $4,707,000.00 that the Defendants wrongfully have obtained from GEICO by submitting, and causing to be submitted, thousands of fraudulent charges relating to initial and follow-up examinations, digital range of motion and muscle tests (the "ROM/Muscle Tests"), outcome assessment testing (the "Outcome Assessment Tests"), physical therapy, and electro-diagnostic tests (the "EDX Tests") (collectively the "Fraudulent Services"). The Fraudulent Services purportedly were provided to individuals who claim to have been involved in automobile accidents and were eligible for insurance coverage under GEICO no-fault insurance policies ("Insureds").

2.     The Defendants never had any right to bill for or to collect no-fault benefits for the Fraudulent Services because the Fraudulent Services were medically useless in general, and were ordered and performed – to the extent that they were performed at all – pursuant to fraudulent, pre-determined protocols designed and implemented by the Defendants solely to maximize the potential charges that they could submit, and cause to be submitted, to GEICO, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them.

3.     Accordingly, in addition to damages, GEICO seeks a declaration that it is not legally obligated to pay more than $3,456,000.00 in currently-pending claims for Fraudulent Services submitted by or on behalf of the Defendants because: (i) the Fraudulent Services that were billed to GEICO by or on behalf of the Defendants were not medically necessary and were performed pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Defendants; (ii) the Fraudulent Services e billed to GEICO by or on behalf of the Defendants in many cases never were performed in the first instance; (iii) the Fraudulent Services were not reimbursable because they were performed – to the extent that they were performed at all –

2

pursuant to kickbacks that the Defendants paid in exchange for patient referrals; and (iv) in many cases, the Fraudulent Services – to the extent that they were provided at all – were not reimbursable because they were provided by independent contractors.

4.     The Defendants fall into the following categories:

(i)     Ahava Medical, P.C. ("Ahava"), Allmed Medical of Williamsburg, P.C. ("Allmed"), Essential Medical Care, P.C. ("Essential Medical"), Lifespan Medical, P.C. ("Lifespan"), Jamaica Medical Plaza, P.C. ('Jamaica Medical"), Lifex Medical Care, P.C. ("Lifex") and S&R Medical, P.C. ("S&R")(collectively the "PC Defendants") are medical professional corporations, through which the Fraudulent Services purportedly were performed and were billed to New York automobile insurance companies, including GEICO.

(ii)     Gracia Mayard ("Mayard"), Nam Hu Nam, M.D. ("Dr. Nam"), Billy Geris, M.D. ("Dr. Geris"), Pavel Yutsis, M.D. ("Dr. Yutsis"), and Yvette Davidov, D.O. ("Dr. Davidov") are – with the exception of Mayard, who recently surrendered his medical license in the face of professional disciplinary and criminal charges – physicians licensed to practice medicine in New York, who purport to own the PC Defendants and who purported to perform many of the Fraudulent Services.

collectively the "PC Defendants", Mayard, Dr. Nam, Dr. Geris, Dr. Yutsis, and Dr. Davidov are the "Defendants"

5.     As discussed below, Defendants at all relevant times have known that:

(i)     the Fraudulent Services were ordered and performed – to the extent that they were performed at all – pursuant to fraudulent, pre-determined protocols designed solely to maximize charges to GEICO and other automobile insurers, not because they were medically necessary or designed to facilitate the treatment of or otherwise benefit the Insureds who purportedly were subjected to them;

(ii)     in many cases, the Fraudulent Services never were performed in the first instance;

(iii)     the current procedural terminology ("CPT") codes, or billing codes, used in connection with the billing for the Fraudulent Services misrepresented and exaggerated the level of services that purportedly were rendered in order to inflate the charges submitted to GEICO;

3

(iv)     the PC Defendants were ineligible to bill for or to collect No-Fault Benefits in connection with the Fraudulent Services because the Fraudulent Services were performed – to the extent that they were performed at all – pursuant to kickbacks that were paid in exchange for patient referrals; and

(v)      the PC Defendants were ineligible to bill for or collect No-Fault Benefits for the Fraudulent Services because they were performed – to the extent that they were performed at all – by independent contractors, rather than by the PC Defendants' employees.

6.       As such, the Defendants do not now have – and never had – any right to be compensated for the Fraudulent Services.

7.       The charts attached hereto as Exhibits "1" through "7" set forth a representative sample of the fraudulent claims that have been identified to-date that the Defendants submitted, or caused to be submitted, to GEICO.   The Defendants' respective interrelated schemes began as early as 2007 and have continued uninterrupted since that time.

8.       As a result of the Defendants' interrelated schemes, GEICO has incurred damages of more than $4,707,000.00.

## THE PARTIES

### I.    Plaintiff

9.       Plaintiffs Government Employees Insurance Co., GEICO Indemnity Co., GEICO General Insurance Company and GEICO Casualty Co., are all Maryland corporations with their principal places of business in Chevy Chase, Maryland. GEICO is authorized to conduct business and to issue policies of automobile insurance in the State of New York.

### II.   Defendants

10.      Defendant Mayard was licensed to practice in New York on July 30, 1982 and served as the nominal or "paper" owner of Ahava.  Mayard resides in and is a citizen of New

4

York.  On or about February 7, 2013 Mayard surrendered his right to prescribe controlled substances, but subsequently, Mayard illegally proscribed controlled substances after his license was surrendered.  Mayard was arrested by the Federal Drug Enforcement Agency in March 2013. On or about May 31, 2013, Mayard surrendered his medical license as the result of an Order of the New York State Department of Health, State Board for Professional Medical Conduct.

11.     On or about March 18, 2013, a Federal Complaint was unsealed in the United States District Court for the Eastern District of New York ("March 2013 Complaint").  The March 2013 Complaint charged Mayard with conspiring to distribute a controlled substance ("Oxycodone").  See United States v. Mayard, 13-CR-00227 (E.D.N.Y. 2013).  The Complaint alleges that in exchange for cash, Mayard would write individuals prescriptions for Oxycodone without even performing examination the individuals.  Id.

12.     Defendant Dr. Nam resides in and is a citizen of New York. Dr. Nam is a physician who has been licensed to practice medicine in New York since July 22, 1985, and purports to own Defendants Essential Medical and Lifespan.

13.     Defendant Dr. Geris resides in and is a citizen of New York. Dr. Geris is a physician who has been licensed to practice medicine in New York since July 9, 1996, and purports to own Defendant Jamaica Medical.

14.     Defendant Dr. Yutsis resides in and is a citizen of New York. Dr. Yutsis is a physician who has been licensed to practice medicine in New York since April 27, 2006, and purports to own Defendant Lifex.

15.     Defendant Dr. Davidov resides in and is a citizen of New Jersey. Dr. Davidov is a physician who has been licensed to practice medicine in New York since January 11, 2000, and purports to own Defendant S&R.

5

16.     Defendant Ahava is a New York medical professional corporation with its principal place of business in New York, through which many of the Fraudulent Services were billed to New York automobile insurance companies, including GEICO.     Ahava was incorporated on June 29, 2007, and nominally is owned on paper by Mayard.

17.     Defendant Allmed is a New York medical professional corporation with its principal place of business in New York, through which many of the Fraudulent Services were billed to New York automobile insurance companies, including GEICO. Allmed was incorporated on March 5, 2008, and was nominally is owned on paper by Dr. Michael I. Bley ("Bley") until his death in January, 2014.

18.     Defendant Essential Medical is a New York medical professional corporation with its principal place of business in New York, through which many of the Fraudulent Services were billed to New York automobile insurance companies, including GEICO.  Essential Medical was incorporated on November 21, 2007, and nominally is owned on paper by Dr. Nam.

19.     Defendant Lifespan is a New York medical professional corporation with its principal place of business in New York, through which many of the Fraudulent Services were billed to New York automobile insurance companies, including GEICO. Lifespan was incorporated on January 17, 2008, and nominally is owned on paper by Dr. Nam.

20.     Defendant Jamaica Medical is a New York medical professional corporation with its principal place of business in New York, through which many of the Fraudulent Services were billed to New York automobile insurance companies, including GEICO. Jamaica Medical was incorporated on June 18, 2007, and nominally is owned on paper by Dr. Geris.

21.     Defendant Lifex is a New York medical professional corporation with its principal place of business in New York, through which many of the Fraudulent Services were

billed to New York automobile insurance companies, including GEICO. Lifex was incorporated on October 2, 2002, and nominally is owned on paper by Dr. Yutsis.

22.     Defendant S&R is a New York medical professional corporation with its principal place of business in New York, through which many of the Fraudulent Services were billed to New York automobile insurance companies, including GEICO. S&R was incorporated on December 3, 2004, and nominally is owned on paper by Dr. Davidov.

## JURISDICTION AND VENUE

23.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1332(a)(1) because the matter in controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs, and is between citizens of different states.  Pursuant to 28 U.S.C. § 1331, this Court also has jurisdiction over the claims brought under 18 U.S.C. §§ 1961 et seq. (the Racketeer Influenced and Corrupt Organizations ("RICO") Act because they arise under the laws of the United States.   In addition, this Court has supplemental jurisdiction over the subject matter of the claims asserted in this action pursuant to 28 U.S.C. § 1367.

24.     Venue in this District is appropriate pursuant to 28 U.S.C. § 1391, as the Eastern District of New York is the District where one or more of the Defendants reside and because this is the District where a substantial amount of the activities forming the basis of the Complaint occurred.

## ALLEGATIONS COMMON TO ALL CLAIMS

I.      **An Overview of the No-Fault Laws and Licensing Statutes**

25.     GEICO underwrites automobile insurance in New York.

26.     New York's no-fault laws are designed to ensure that injured victims of motor vehicle accidents have an efficient mechanism to pay for and receive the health care services that

they need.  Under New York's Comprehensive Motor Vehicle Insurance Reparations Act (N.Y. Ins. Law §§ 5101, et seq.) and the regulations promulgated pursuant thereto (11 N.Y.C.R.R. §§ 65, et seq.) (collectively referred to as the "No-Fault Laws"), automobile insurers are required to provide Personal Injury Protection Benefits ("No-Fault Benefits") to Insureds.

27.    No-Fault Benefits include up to $50,000.00 per Insured for necessary expenses that are incurred for healthcare goods and services, including physician services, chiropractic services, physical therapy services, and acupuncture services.

28.    An Insured can assign his/her right to No-Fault Benefits to health care goods and services providers in exchange for those services.  Pursuant to a duly executed assignment, a health care provider may submit claims directly to an automobile insurance company and receive payment for medically necessary services, using the claim form required by the New York State Department of Insurance (known as "Verification of Treatment by Attending Physician or Other Provider of Health Service" or, more commonly, as an "NF-3").  In the alternative, a healthcare provider may submit claims using the Health Care Financing Administration insurance claim form (known as the "HCFA-1500" form).

29.    Pursuant to the No-Fault Laws, professional corporations are not eligible to bill for or to collect No-Fault Benefits if they fail to meet any New York State or local licensing requirements necessary to provide the underlying services.

30.    The implementing regulation adopted by the Superintendent of Insurance, 11 N.Y.C.R.R. § 65-3.16(a)(12) states, in pertinent part, as follows:

> A provider of health care services is not eligible for reimbursement under section 5102(a)(1) of the Insurance Law if the provider fails to meet any applicable New York State or local licensing requirement necessary to perform such service in New York … .

31. New York law prohibits licensed healthcare providers from paying or accepting kickbacks in exchange for patient referrals. See, e.g., New York Education Law §§ 6509-a; 6531. Accordingly, under the No-Fault Laws, a physician or medical professional corporation is not eligible to receive No-Fault Benefits if, among other things, the physician or medical professional corporation pays or receives unlawful kickbacks in exchange for patient referrals.

32. In State Farm Mut. Auto. Ins. Co. v. Mallela, 4 N.Y.3d 313, 320 (2005), the New York Court of Appeals confirmed that (i) healthcare providers that fail to comply with licensing requirements are ineligible to collect No-Fault Benefits, and that (ii) insurers may look beyond a facially-valid license in order to determine whether there was a failure to abide by state and local law.

33. Pursuant to the No-Fault Laws, only healthcare services providers in possession of a direct assignment of benefits are entitled to bill for and collect No-Fault Benefits. There is both a statutory and regulatory prohibition against payment of No-Fault Benefits to anyone other than the patient or his/her healthcare services provider. The implementing regulation adopted by the Superintendent of Insurance, 11 N.Y.C.R.R. § 65-3.11, states – in pertinent part – as follows:

> An insurer shall pay benefits for any element of loss … directly to the applicant or ... upon assignment by the applicant ... shall pay benefits directly to providers of healthcare services as covered under section five thousand one hundred two (a)(1) of the Insurance Law …

34. Accordingly, for a healthcare provider to be eligible to bill for and to collect charges from an insurer for healthcare services pursuant to Insurance Law § 5102(a), it must be the actual provider of the services. Under the No-Fault Laws, a professional corporation is not eligible to bill for services, or to collect for those services from an insurer, where the services were rendered by persons who were not employees of the professional corporation, such as independent contractors.

35.     Pursuant to New York Insurance Law § 403, the NF-3 and HCFA-1500 forms submitted by healthcare providers to GEICO, and to all other automobile insurers, must be verified by the healthcare providers subject to the following warning:

> Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information, or conceals for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent insurance act, which is a crime.

## II.     The Defendants' Fraudulent Treatment and Billing Scheme

36.     Beginning in 2007, and continuing through the present day, the Defendants have masterminded and implemented a complex series of interrelated fraudulent schemes in which the PC Defendants were used to bill the New York automobile insurance industry millions of dollars for medically unnecessary services, services that never were provided in the first instance, and services that otherwise were unreimburseable.

### A.     The Kickbacks

37.     The PC Defendants do not maintain stand-alone practices, are not the owners or leaseholders in the real property from which they have operated, do not advertise for patients, and do not employ their own support staff.

38.     Rather, the PC Defendants have operated through a network of so-called "healthcare clinic locations" that are located throughout the greater New York City area (the "Clinics") that were ostensibly organized to provide a range of healthcare services to Insureds at a single location, but rather, these Clinics in actuality are organized to supply "one-stop" shops for no-fault insurance fraud.

39.     These Clinics have provided facilities for the PC Defendants, as well as – variously – one or more additional medical professional corporations, chiropractic professional

corporations, acupuncture professional corporations, and/or physical therapy professional corporations.

40.     The PC Defendants gained access to these Clinics by paying kickbacks to the individuals and entities that controlled the Clinics. The kickbacks were disguised as ostensibly legitimate fees to "lease" space and/or personnel from the Clinics. In fact, these were "pay-to-play" arrangements that caused the Clinics to provide access to Insureds and to steer the Insureds to the PC Defendants for the Fraudulent Services.

41.     In exchange for these kickbacks, when an Insured visited one of the Clinics, he or she automatically was referred to one of the PC Defendants for the Fraudulent Services, regardless of individual symptoms, presentment or – in virtually every case – the total absence of any medical problems arising from any automobile accident that would warrant the Fraudulent Services.

42.     The unlawful kickback relationships that the Defendants established with the Clinics were essential to the success of the Defendants' fraudulent scheme.

43.     The Defendants derived significant financial benefit from the relationships because without the access to the Insureds provided by the Clinics, the Defendants would not have the ability to implement their fraudulent treatment and billing protocol, bill automobile insurers including GEICO, or generate income from insurance claim payments. The Clinics likewise benefitted from their unlawful kickback relationships with the Defendants through the financial benefit conferred by the kickbacks, themselves.

44.     Virtually all of the Insureds whom the Defendants purported to treat were involved in relatively minor, "fender-bender" accidents, to the extent that they were involved in any actual accidents at all. Concomitantly, virtually none of the Insureds whom the Defendants

purported to treat suffered from any significant injuries or health problems as a result of the relatively minor accidents they experienced or purported to experience.

45.    Even so, the Defendants purported to subject virtually every Insured to an identical, medically unnecessary course of "treatment" that was provided pursuant to a pre-determined, fraudulent protocol designed to maximize the billing that they could submit through the PC Defendants to insurers, including GEICO.

46.    The Defendants purported to provide their pre-determined fraudulent treatment protocol to Insureds without regard for the Insureds' individual symptoms or presentment, or – in most cases – the total absence of any actual medical problems arising from any actual automobile accidents.

47.    Each step in the Defendants' fraudulent treatment protocol was designed to falsely reinforce the rationale for the previous step and provide a false justification for the subsequent step, and thereby permit the Defendants to generate and falsely justify the maximum amount of fraudulent no-fault billing for each Insured.

48.    No legitimate physician would permit the fraudulent treatment and billing protocol described below to proceed under his or her auspices, nor would any legitimate physician or other healthcare services provider refer a patient for the fraudulent treatment protocol described below.

49.    The Defendants permitted the fraudulent treatment and billing protocol described below to proceed under their auspices because they sought to profit from the fraudulent billing submitted to GEICO and other insurers, and the Clinics referred Insureds to the Defendants for the fraudulent treatment protocol described below because they received kickbacks from the PC

Defendants and because they sought to use the fraudulent treatment records generated by the Defendants to support other billing for medically useless services.

**B.      The Fraudulent Initial Examinations**

50.      Upon receiving a referral pursuant to the kickbacks paid to the Clinics, the Defendants purported to provide many of the Insureds with an initial examination.

51.      The Defendants then typically billed the initial examinations to GEICO under current procedural terminology ("CPT") codes 99245, 99244, or 99205, resulting in a charge of between $154.30 and $230.09 for each initial examination that the Defendants purported to provide.

52.      The Defendants' charges for the initial examinations were fraudulent in that the initial examinations were medically unnecessary and were provided – to the extent that they were provided at all – pursuant to the kickbacks that the Defendants paid to the Clinics.

53.      In cases where the Defendants billed for the initial examinations under CPT codes 99205, 99245 or 99244, the charges also were fraudulent in that they misrepresented the nature of the underlying service.

54.      According to the New York Workers' Compensation Fee Schedule (the "Fee Schedule"), which is applicable to claims for No-Fault Benefits, the use of CPT codes 99245 or 99244 represents that the physician performed a consultation at the request of another physician or other appropriate source.

55.      The Defendants did not provide their initial examinations – to the extent that they were provided at all – at the request of any other physicians or other appropriate sources. Rather, to the extent that the initial examinations were performed in the first instance, they were

performed solely as part of the Defendants' fraudulent treatment protocol, pursuant to the kickbacks that the Defendants paid to the Clinics.

56.    Furthermore, the Defendants' use of CPT codes 99245 and 99244 represented that the physicians who purportedly conducted the examinations submitted a written consultation report to the physicians or other appropriate sources who purportedly requested the examinations in the first instance.

57.    Though the Defendants routinely billed for the initial examinations/consultations under CPT codes 99245 and 99244, the Defendants never submitted any written consultation report to any physician or other referring healthcare provider, because the initial examinations were not conducted at the request of any referring physician or healthcare provider.

58.    Furthermore, the Defendants' charges for the initial examinations were fraudulent in that they misrepresented the extent of the examinations. Pursuant to the Fee Schedule, the use of CPT codes 99245, 99244, or 99205 typically requires that the Insured present with problems of moderate to high severity.

59.    Though the Defendants routinely billed for the initial examinations using CPT codes 99245, 99244, or 99205, the Insureds almost never presented with problems of moderate to high severity or even low to moderate severity. Rather, to the extent that the Insureds had any health problems at all as the result of any automobile accidents, the problems were of low severity.

60.    For instance, in keeping with the fact that almost all of the accidents giving rise to the Defendants' billing were minor fender-benders that did not seriously injure the Insureds, in most cases the Insureds did not seek treatment at any hospital as the result of their accidents.  To

the limited extent that the Insureds did report to a hospital after their accidents, they typically were observed briefly on an outpatient basis and then sent on their way after a few hours.

61.     In many cases, contemporaneous police reports indicated that no one was injured in the underlying accidents, and that the Insureds' vehicles were operable immediately following the accidents.

62.     Furthermore, the use of CPT codes 99205 and 99244 typically requires that the physician spend 60 minutes face-to-face with the patient and/or the patient's family, whereas CPT code 99245 typically requires that the physician spend 80 minutes face-to-face with the patient and/or the patient's family.

63.     Though the Defendants routinely billed for the initial examinations under CPT codes 99245, 99244, and 99205, no physician associated with the Defendants ever spent 60 minutes, much less 80 minutes, performing the initial examinations. Rather, the initial examinations rarely lasted more than 15-20 minutes, to the extent that they were ever conducted at all.

64.     In keeping with the fact that the initial examinations rarely lasted more than 15-20 minutes, the Defendants used boilerplate and template forms in conducting the initial examinations. The boilerplate and template forms used set forth a very limited range of potential patient complaints, examination/diagnostic testing options, potential diagnoses, and treatment recommendations. In fact, all that was required to complete the boilerplate and template forms was a brief patient interview and a brief physical examination of the Insureds, consisting of a check of some of the Insureds' vital signs, and basic range of motion and muscle strength testing.

65.     These interviews and examinations did not require any physicians associated with the PC Defendants to spend more than 15-20 minutes of face-to-face time with the Insureds.

15

66.     In addition, pursuant to the Fee Schedule, when the Defendants submitted charges under CPT codes 99245 and 99205, they falsely represented that they: (i) conducted a "comprehensive" physical examination; and (ii) engaged in medical decision-making of "high complexity".

67.     Pursuant to the Fee Schedule, when the Defendants submitted charges under CPT code 99244, they falsely represented that they: (i) conducted a "comprehensive" physical examination; and (ii) engaged in medical decision-making of "moderate complexity".

68.     Pursuant to the Fee Schedule, a physical examination does not qualify as "comprehensive" unless the healthcare provider either: (i) conducts a general examination of multiple patient organ systems; or (ii) conducts a complete examination of a single patient organ system.

69.     The Fee Schedule identifies the following organ systems: (i) eyes; (ii) ears, nose, mouth, and throat; (iii) cardiovascular; (iv) respiratory; (v) gastrointestinal; (vi) genitourinary; (vii) musculoskeletal; (viii) skin; (ix) neurologic; (x) psychiatric; and (xi) hematologic/lymphatic/immunologic.

70.     Though the Defendants routinely billed for the initial examinations under CPT codes 99245, 99244, and 99205 and falsely represented that they conducted a "comprehensive" physical examination of Insureds during the initial examinations, they never conducted a general examination of multiple organ systems, nor did they conduct a complete examination of a single organ system.

71.     Pursuant to the American Medical Association's CPT Assistant (the "CPT Assistant"), which is incorporated by reference into the Fee Schedule, medical decision-making does not qualify as "highly complex" unless the decision-making meets at least two of the

16

following three criteria: (i) consideration of an extensive number of diagnoses or management options; (ii) review of either an extensive amount of data or data that are extensively complex; and/or (iii) presenting problems that carry a high risk of complications and/or morbidity or mortality.

72.     Along similar lines, pursuant to the CPT Assistant, medical decision-making does not qualify as "moderately complex" unless the decision-making meets at least two of the following three criteria: (i) consideration of multiple diagnoses or management options; (ii) review of either a moderate amount of data or data that are moderately complex; and/or (iii) presenting problems that carry a moderate risk of complications and/or morbidity or mortality.

73.     Pursuant to the CPT Assistant, the number of possible diagnoses and/or the number of management options that must be considered is based on the number and types of problems addressed during the encounter, the complexity of establishing a diagnosis, and the management decisions that are made by the physician. In addition, pursuant to the CPT Assistant, the amount and complexity of data that must be reviewed is based on the types of diagnostic testing that are ordered or reviewed.  Furthermore, pursuant to the CPT Assistant, the risk of significant complications, morbidity, and/or mortality is based on the risks associated with the presenting problems, the diagnostic procedures, and the possible management options.

74.     The Defendants routinely billed for the initial examinations under CPT codes 99245, 99244, or 99205, and thereby falsely represented that they engaged in either highly or moderately complex medical decision-making with respect to the Insureds they purported to treat during the initial examinations.

75.     In fact, with respect to the initial examination charges submitted, the Defendants never engaged in moderately complex medical decision-making, much less highly complex

17

medical decision-making, because they did not ever review an extensive or moderate amount of data or data that were moderately or extensively complex.

76. For instance, the initial examination reports indicated that the Defendants– at most – reviewed MRI studies and ordered ROM/Muscle Tests, EDX Tests, and Outcome Assessment Tests, none of which are complex for a qualified physician to perform or to interpret. Furthermore, there was no risk of significant complications, morbidity, or mortality – much less a high or moderate risk – from the Insureds' relatively minor medical complaints of back pain, neck pain, or pain in their limbs, to the limited extent that they ever had any medical complaints arising from automobile accidents at all. Nor, by extension, was there any risk of significant complications, morbidity, or mortality from the diagnostic procedures or treatment options provided by the PC Defendants, to the extent that they provided any such diagnostic procedures or treatment options in the first instance.

77. In almost every instance, the only diagnostic procedures and "treatments" that the Defendants actually provided were limited to a series of medically unnecessary diagnostic tests (i.e., ROM/Muscle Tests, EDX Tests, and Outcome Assessment Tests), and physical therapy, none of which are health or life-threatening if properly administered.

78. In fact, the Defendants did not engage in any medical decision-making at all with respect to the initial examinations.

79. Rather, the outcome of the initial examinations was pre-determined for virtually every Insured to result in phony boilerplate "diagnoses" of sprains/strains and contusions.

80. The Defendants falsely diagnosed the Insureds with sprains/strains and contusions solely as a false basis to order and bill for ROM/Muscle Tests, physical therapy, EDX Tests, and Outcome Assessment Tests.

18

**C.     The Fraudulent Follow-Up Examinations**

81.     In addition to the fraudulent initial examinations, the Defendants typically purported to subject Insureds to two or more fraudulent follow-up examinations during the course of their fraudulent treatment protocol.

82.     The PC Defendants then virtually always billed the follow-up examinations to GEICO either under CPT codes 99215 or 99214, resulting in a charge of between $71.49 and 182.18 for each follow-up examination that the Defendants purported to provide.

83.     Furthermore, the Defendants' charges for the follow-up examinations were fraudulent in that they misrepresented the extent of the examinations.

84.     Pursuant to the Fee Schedule, the use of CPT codes 99215 or 99214 typically requires that the Insured present with problems of moderate to high severity.

85.     Though the Defendants routinely billed for the follow-up examinations using CPT codes 99215 or 99214, the Insureds almost never presented with problems of moderate to high severity or even low to moderate severity. Rather, to the extent that the Insureds had any problems at all as the result of any automobile accidents, the problems were of low severity.

86.     For instance, in keeping with the fact that almost all of the accidents giving rise to the Defendants' billing were minor fender-benders that did not seriously injure the Insureds, in most cases the Insureds did not seek treatment at any hospital as the result of their accidents. To the limited extent that the Insureds did report to a hospital, they virtually always were briefly observed on an outpatient basis and then sent on their way after a few hours.

87.     In many cases, contemporaneous police reports indicated that no one was injured in the underlying accidents, and that the Insureds' vehicles were drivable immediately following the accidents.

88.     Furthermore, the use of CPT code 99215 typically requires that the physician spend 40 minutes face-to-face with the patient and/or the patient's family, and the use of CPT code 99214 typically requires that the physician spend 25 minutes face-to-face with the patient and/or the patient's family.

89.     Though the Defendants routinely billed for the follow-up examinations under CPT codes 99215 or 99214, no physician associated with the PC Defendants ever spent 25 minutes, much less 40 minutes, on the follow-up examinations. Rather, the initial examinations rarely lasted more than 10 minutes, to the extent that they were conducted at all.

90.     In keeping with the fact that the follow-up examinations rarely lasted more than 10 minutes, the Defendants used pre-printed template forms in conducting the follow-up examinations.

91.     In addition, pursuant to the Fee Schedule, when the PC Defendants submitted charges under CPT code 99215, they falsely represented that they: (i) conducted a "comprehensive" physical examination; and (ii) engaged in medical decision-making of "high complexity".

92.     Pursuant to the Fee Schedule, when the PC Defendants submitted charges under CPT code 99214, they falsely represented that they: (i) conducted a "detailed" physical examination; and (ii) engaged in medical decision-making of "moderate complexity".

93.     Pursuant to the Fee Schedule, a physical examination does not qualify as "comprehensive" unless the healthcare provider either: (i) conducts a general examination of multiple patient organ systems; or (ii) conducts a complete examination of a single patient organ system.

94.     Pursuant to the Fee Schedule, a physical examination does not qualify as "detailed" unless the healthcare provider conducts an extended examination of the affected body areas and other symptomatic or related organ systems.

95.     Though the Defendants routinely billed for the follow-up examinations under CPT codes 99215, and therefore falsely represented that they conducted a "comprehensive" physical examination of Insureds during the follow-up examinations, they never conducted a general examination of multiple organ systems, nor did they conduct a complete examination of a single organ system.

96.     Though the Defendants routinely billed for the follow-up examinations under CPT code 99214, and therefore falsely represented that they conducted a "detailed" physical examination of Insureds during the follow-up examinations, they never conducted an extended examination of the affected body areas and other symptomatic or related organ systems

97.     Pursuant to the American Medical Association's CPT Assistant (the "CPT Assistant"), which is incorporated by reference into the Fee Schedule, medical decision-making does not qualify as "highly complex" unless the decision-making meets at least two of the following three criteria: (i) consideration of an extensive number of diagnoses or management options; (ii) review of either an extensive amount of data or data that are extensively complex; and/or (iii) presenting problems that carry a high risk of complications and/or morbidity or mortality.

98.     Along similar lines, pursuant to the CPT Assistant, medical decision-making does not qualify as "moderately complex" unless the decision-making meets at least two of the following three criteria: (i) consideration of multiple diagnoses or management options; (ii)

review of either a moderate amount of data or data that are moderately complex; and/or (iii) presenting problems that carry a moderate risk of complications and/or morbidity or mortality.

99.     Pursuant to the CPT Assistant, the number of possible diagnoses and/or the number of management options that must be considered is based on the number and types of problems addressed during the encounter, the complexity of establishing a diagnosis, and the management decisions that are made by the physician.

100.    Pursuant to the CPT Assistant, the amount and complexity of data that must be reviewed is based on the types of diagnostic testing that are ordered or reviewed.   In addition, pursuant to the CPT Assistant, the risk of significant complications, morbidity, and/or mortality is based on the risks associated with the presenting problems, the diagnostic procedures, and the possible management options.

101.    The Defendants billed for the follow-up under CPT codes 99215 and 99214, and falsely represented that they engaged in either highly or moderately complex medical decision-making with respect to the Insureds they purported to treat during the follow-up examinations.  In fact, the PC Defendants never engaged in moderately complex medical decision-making, much less highly complex medical decision-making, because they did not ever review an extensive or moderate amount of data or data that were moderately or extensively complex.

102.    Furthermore, there was no risk of significant complications, morbidity, or mortality – much less a high or moderate risk – from the Insureds' relatively minor medical complaints of back pain, neck pain, or pain in their limbs, to the limited extent that they ever had any medical complaints arising from automobile accidents at all.  Nor, by extension, was there any risk of significant complications, morbidity, or mortality from the diagnostic procedures or

treatment options provided by the Defendants, to the extent that they provided any such diagnostic procedures or treatment options in the first instance.

103.    In almost every instance, the only diagnostic procedures and "treatments" that the PC Defendants actually provided were limited to a series of medically unnecessary diagnostic tests (i.e., ROM/Muscle Tests, EDX Tests, and Outcome Assessment Tests), and physical therapy, none of which are health- or life-threatening if properly administered.

104.    In fact, the PC Defendants did not engage in any medical decision-making at all with respect to the follow up examinations.

105.    Rather, the outcome of the follow-up examinations was pre-determined for virtually every Insured to reinforce and perpetuate the phony boilerplate "diagnoses" of sprains/strains and contusions that were provided to the Insureds during the initial examinations. The Defendants falsely confirmed the phony boilerplate diagnoses sprains/strains and contusions solely as a false basis to order and bill for ROM/Muscle Tests, physical therapy, Consultations, EDX Tests, and Outcome Assessment Tests.

**D.    The Fraudulent Unbundling of Examinations and Billing for Outcome Assessment Tests**

106.    In many cases, the Defendants fraudulently unbundled their charges for the initial and follow-up examinations, by submitting a separate charge under CPT code 99358 for Outcome Assessment Tests alleged to have been provided contemporaneously with the initial and follow-up examinations.

107.    The Outcome Assessment Tests that the Defendants purported to provide to Insureds were simply pre-printed, multiple-choice questionnaires on which the Insureds were invited to report the symptoms they purportedly were experiencing and the impact of those

23

symptoms on their lives. The Insureds' responses to the questionnaires then were fed into a computer, which automatically generated a report that rated the Insureds' responses according to pre-set criteria.

108.   Since a patient history and physical examination must be conducted as an element of a soft-tissue trauma patient's initial and follow-up examinations, and since the Outcome Assessment Tests that the Defendants purported to provide were nothing more than questionnaires regarding the Insureds' history and physical condition, the Fee Schedule provides that the Outcome Assessment Tests are to be reimbursed as an element of the initial examinations and follow-up examinations.

109.   In other words, healthcare providers cannot conduct and bill for an initial examination or follow-up examination, then bill separately for the type of contemporaneously-provided Outcome Assessment Tests that the Defendants purported to provide.

110.   The information gained through the use of the Outcome Assessment Tests that the Defendants purported to provide was not significantly different from the information that the Defendants purported to obtain during the initial examination and follow-up examinations.

111.   Under the circumstances employed by the Defendants, the Outcome Assessment Tests represented purposeful and unnecessary duplication of the patient histories and examinations purportedly conducted during the initial examination and follow-up examination. The Outcome Assessment Tests were part and parcel of the Defendants' fraudulent schemes, inasmuch as the "service" was rendered pursuant to a pre-determined protocol that: (i) in no way aided in the assessment and treatment of the Insureds; and (ii) was designed solely to financially enrich the Defendants.

112. The PC Defendants' use of CPT code 99358 to bill for the Outcome Assessment Tests also constituted a deliberate misrepresentation of the extent of the service that was provided.

113. Pursuant to the Fee Schedule, the use of CPT code 99358 represents – among other things – that a physician actually has spent at least one hour performing some prolonged service, such as review of extensive records and tests, or communication with the patient and his or her family. Though the Defendants routinely submitted billing for the Outcome Assessment Tests under CPT code 99358, they did not spend any time whatsoever reviewing or administering the tests, much less one hour.

114. Upon information and belief, the Defendants charges for the Outcome Assessment Tests also misrepresented the identity of the individual who performed the Outcome Assessment Tests.

115. Pursuant to the Fee Schedule, the use of CPT code 99358 represents that the underlying service actually was performed by a physician or other licensed healthcare provider, and all of the Defendants' charges for "outcome assessment testing" represented that a licensed physician performed the underlying service. However, the Outcome Assessment Tests did not require any physician involvement whatsoever. Rather, the Insureds completed the pre-printed questionnaires, and a computer automatically generated a report that rated the Insureds' responses according to pre-set criteria.

116. The Defendants misrepresented that licensed physicians played some role in the performance of the tests in order to support their charges using CPT code 99358, when in fact the charges for the Outcome Assessment Tests were unreimburseable under CPT code 99358 because the tests were not performed by physicians.

25

### E.  The Fraudulent ROM/Muscle Tests

117.  In an attempt to maximize the fraudulent billing that they submitted or cause to be submitted for each Insured, after purporting to provide initial examinations, Mayard, Ahava, Allmed, Dr. Nam, Essential Medical, Dr. Geris, Jamaica Medical, Dr. Yutsis, Lifex, Dr. Davidov and S&R (collectively the "ROM Defendants") instructed most Insureds to return for one or more rounds of medically useless ROM/Muscle Tests.  The charges for the computerized ROM/Muscle Tests were fraudulent in that the computerized ROM tests were medically unnecessary and were performed pursuant to the ROM Defendants' fraudulent treatment protocol.

118.  Like the ROM Defendants' charges for the other Fraudulent Services they purported to provide, the charges for the ROM/Muscle Tests were fraudulent in that the ROM/Muscle Tests were medically unnecessary and were performed – to the extent that they were performed at all – pursuant to the kickbacks that the ROM Defendants paid to the Clinics.

### 1.  Traditional Tests to Evaluate the Human Body's Range of Motion and Muscle Strength

119.  The adult human body is made up of 206 bones joined together at various joints that either are of the fixed, hinged or ball-and-socket variety.  The body's hinged joints and ball-and-socket joints facilitate movement, allowing a person to – for example – bend a leg, rotate a shoulder, or move the neck to one side.

120.  The measurement of the capacity of a particular joint to perform its full and proper function represents the joint's "range of motion".  Stated in a more illustrative way, range of motion is the amount that a joint will move from a straight position to its bent or hinged position.

121.   A traditional, or manual, range of motion test consists of a non-electronic measurement of the joint's ability to move in comparison with an unimpaired or "ideal" joint.  In a traditional range of motion test, the physician asks the patient to move his or her joints at various angles, or the physician moves the joints. The physician then evaluates the patient's range of motion either by sight or through the use of a manual inclinometer or a goniometer (i.e., a device used to measure angles).

122.   Similarly, a traditional muscle strength test consists of a non-electronic measurement of muscle strength, which is accomplished by having the patient move his/her body in a given direction against resistance applied by the physician.  For example, if a physician wanted to measure muscle strength in the muscles surrounding a patient's knee, he would apply resistance against the patient's leg while having him/her move the leg up, then apply resistance against the patient's leg while having him/her move the leg down.

123.   Physical examinations performed on patients with soft-tissue trauma – the alleged complaint advanced by virtually every Insured who treated with the ROM Defendants – necessarily require range of motion and muscle strength tests, inasmuch as these tests provide a starting point for injury assessment and treatment planning.  Unless a physician knows the extent of a given patient's joint or muscle strength impairment, there is no way to properly diagnose or treat the patient's injuries.  Evaluation of range of motion and muscle strength is an essential component of the "hands-on" examination of a trauma patient.

124.   Since range of motion and muscle strength tests must be conducted as an element of a soft-tissue trauma patient's initial consultation, as well as during any follow-up examinations, the Fee Schedule provides that range of motion and muscle strength tests are to be reimbursed as an element of the initial consultations and follow-up examinations.

27

125.    In other words, healthcare providers cannot conduct and bill for an initial consultation or follow-up examination, then bill separately for contemporaneously-provided ROM/Muscle Tests.

### 2.    The ROM Defendants Duplicate Billing for Medically Unnecessary ROM/Muscle Tests

126.    To the extent that the ROM Defendants actually provided initial examinations and follow-up examinations in the first instance, the ROM Defendants conducted manual range of motion and manual muscle tests on virtually every Insured during each initial and/or follow-up examination.

127.    The charges for the manual range of motion and manual muscle tests were part and parcel of the charges that the ROM Defendants routinely submitted to GEICO and other New York automobile insurance companies for the initial examinations under CPT codes 99205, 99244, and 99245, and for the follow-up examinations under CPT codes 99215 and 99214.

128.    Despite the fact that every Insured already purportedly had undergone manual range of motion and muscle testing during the initial examination and/or follow-up examination, and despite the fact that reimbursement for range of motion and muscle testing already had been paid by GEICO as a component of reimbursement for the initial examinations and/or follow-up examinations, the ROM Defendants systemically billed for, and purported to perform, a series of computerized ROM/Muscle Tests  on most Insureds.

129.    Though the Insureds routinely visited the Clinics several times per month for follow-up examinations and other Fraudulent Services, the ROM Defendants often deliberately scheduled separate appointments for computerized range of motion and muscle tests so that they

could bill for those procedures separately, without having to include them in the billing for the follow-up examinations, as required by the Fee Schedule.

130.     The ROM Defendants purported to provide the computerized range of motion tests by placing a digital inclinometer or goniometer on various parts of the Insureds' bodies (affixed by Velcro straps) while the Insured was asked to attempt various motions and movements.   The test was virtually identical to the manual range of motion testing that is described above and that purportedly was performed during each initial examination and follow-up examination, except that a digital printout was obtained rather than the provider manually documenting the Insured's range of motion.

131.     The ROM Defendants purported to have provided the computerized muscle strength tests by placing a strain gauge-type measurement apparatus against a stationary object, against which the patient pressed three-to-four separate times using various muscle groups. As with the computerized ROM tests, this computerized muscle strength test was virtually identical to the manual muscle strength testing that is described above and that purportedly was performed during the initial examinations and/or follow-up examinations – except that a digital printout was obtained.

132.     The information gained through the use of the computerized ROM tests and muscle tests was not significantly different from the information obtained through the manual testing that was part and parcel of virtually every Insured's initial examination and follow-up examinations.

133.     In the relatively minor soft-tissue injuries allegedly sustained by the Insureds – to the extent that any of the Insureds suffered any injuries at all as the result of the automobile accidents they purported to experience – the difference of a few percentage points in the

Insured's range of motion reading or pounds of resistance in the Insured's muscle strength testing was meaningless. This is evidenced by the fact that the ROM Defendants never incorporated the results of computerized ROM/Muscle Tests into the rehabilitation programs of any of the Insureds whom they purported to treat.

134.    The computerized ROM tests and muscle tests were part and parcel of the ROM Defendants' interrelated fraudulent schemes, inasmuch as the "service" was rendered pursuant to a pre-established protocol that: (i) in no way aided in the assessment and treatment of the Insureds; and (ii) was designed solely to financially enrich the ROM Defendants.

**3.    The ROM Defendants' Fraudulent Unbundling of Charges for ROM/Muscle Tests**

135.    Not only did the ROM Defendants deliberately conduct duplicative, medically unnecessary ROM/Muscle Tests, they also unbundled the tests in order to maximize the fraudulent charges that they could submit, or cause to be submitted, to GEICO.

136.    Pursuant to the Fee Schedule, when computerized range of motion testing and muscle testing are performed on the same date, all of the testing should be reported and billed using CPT code 97750.

137.    CPT code 97750 is a "time-based" code that allows for a single charge of $45.71 for every 15 minutes of testing that is performed.  Thus, if a provider performed 15 minutes of computerized range of motion and muscle testing, it would be permitted a single charge of $45.71 under CPT code 97750.  If the provider performed 30 minutes of computerized range of motion and muscle testing, it would be permitted to submit two charges of $45.71 under CPT code 97750, resulting in total charges of $91.42. If the provider performed 45 minutes of

computerized range of motion and muscle testing, it would be permitted to submit three charges of $45.71 under CPT code 97750, resulting in total charges of $137.13, and so forth.

138.     The ROM Defendants virtually always purported to provide computerized range of motion and muscle tests to Insureds on the same dates of service.

139.     To the extent that the ROM Defendants actually provided the ROM/Muscle Tests to Insureds in the first instance, the ROM/Muscle Tests – together – never took more than 15 minutes to perform.

140.     Thus, even if the ROM/Muscle Tests that the ROM Defendants purported to perform were medically necessary, and performed in the first instance, they would be limited to a single, time-based charge of $45.71 under CPT code 97750 for each date of service on which they performed computerized range of motion and muscle tests on an Insured.

141.     In order to maximize their fraudulent billing for the ROM/Muscle Tests, the ROM Defendants unbundled what should have been – at most – a single charge of $45.71 under CPT code 97750 for both computerized range of motion and muscle testing into: (i) multiple charges of $45.71 under CPT code 95831 (for the muscle tests); and multiple charges of $43.60 under CPT code 95851 (for the range of motion tests).

142.     By unbundling what should – at most – have been single $45.71 charges under CPT code 97750 into multiple charges under CPT codes 95831 and 95851, the ROM Defendants generally submitted hundreds of dollars in excess charges for each round of computerized range of motion and muscle testing they purported to provide.

**F.     The Fraudulent EDX Tests**

143.    The Defendants also purported to subject most Insureds to a series of medically unnecessary EDX Tests, consisting of electromyography ("EMG") tests and nerve conduction velocity ("NCV") tests.

144.    Like the charges for the other Fraudulent Services, the charges for the EDX Tests were fraudulent in that the EDX Tests were medically unnecessary and were performed pursuant to the Defendants' pre-determined fraudulent treatment protocol and the kickbacks that the Defendants paid to the Clinics.

**1.      The Human Nervous System and Electrodiagnostic Testing**

145.    The human nervous system is composed of the brain, spinal cord, spinal nerve roots, and peripheral nerves that extend throughout the body, including, the arms and legs and into the hands and feet. Two primary functions of the nervous system are to collect and relay sensory information through the nerve pathways into the spinal cord and up to the brain, and to transmit signals from the brain into the spinal cord and through the peripheral nerves to initiate muscle activity throughout the body.

146.    The nerves responsible for collecting and relaying sensory information to the brain are called sensory nerves, and the nerves responsible for transmitting signals from the brain to initiate muscle activity throughout the body are called motor nerves.  The peripheral nervous system consists of both sensory and motor nerves. They carry electrical impulses throughout the body, from the spinal cord and extending, for example, into the hand and feet through the arms and legs.

147.    The segments of nerves closest to the spine and through which impulses travel between the peripheral nerves and the spinal cord are called the nerve roots. A "pinched" nerve

32

root is called a radiculopathy, and can cause various symptoms including pain, altered sensation, altered reflexes on examination, and loss of muscle control.

148.    EMG tests and NCV tests are forms of electrodiagnostic tests, and purportedly were provided by the Defendants because they were medically necessary to determine whether the Insureds had radiculopathies.

149.    The American Association of Neuromuscular Electrodiagnostic Medicine ("AANEM"), which consists of thousands of neurologists and physiatrists and is dedicated solely to the scientific advancement of neuromuscular medicine, has adopted a recommended policy (the "Recommended Policy") regarding the optimal use of electrodiagnostic medicine in the diagnosis of various forms of neuropathies, including radiculopathies. The Recommended Policy accurately reflects the demonstrated utility of various forms of electrodiagnostic tests, and has been endorsed by two other premier professional medical organizations, the American Academy of Neurology and the American Academy of Physical Medicine and Rehabilitation. A copy of the Recommended Policy is annexed hereto as Exhibit "8."

150.    According to the Recommended Policy, NCV tests should be performed directly by a physician or performed by a trained individual under the direct supervision of a physician.

151.    According to the Recommended Policy, the maximum number of NCV tests necessary to diagnose a radiculopathy in 90 percent of all patients is: (i) NCV tests of three motor nerves; (ii) NCV tests of two sensory nerves; and (iii) two H-reflex studies. See Exhibit "8."

152.    According to the Recommended Policy, the maximum number of EMG tests necessary to diagnose a radiculopathy in 90 percent of all patients is EMG tests of two limbs. See Exhibit "8."

2.     **The Fraudulent NCVs**

153.    NCV tests are non-invasive tests in which peripheral nerves in the arms and legs are stimulated with an electrical impulse to cause the nerve to depolarize. The depolarization, or "firing," of the nerve is transmitted, measured and recorded with electrodes attached to the surface of the skin. An EMG machine then documents the timing of the nerve response (the "latency"), the magnitude of the response (the "amplitude"), and the speed at which the nerve conducts the impulse over a measured distance from one stimulus to another (the "conduction velocity").

154.    In addition, the EMG machine displays the changes in amplitude over time as a "waveform." The amplitude, latency, velocity, and shape of the response then should be compared with well-defined normal values to identify the existence, nature, extent, and specific location of any abnormalities in the sensory and motor nerve fibers.

155.    There are several motor and sensory peripheral nerves in the arms and legs that can be tested with NCVs. Moreover, most of these peripheral nerves have both sensory and motor nerve fibers, either or both of which can be tested with NCVs.

156.    F-wave and H-reflex studies are additional types of NCV tests that may be conducted in addition to the sensory and motor nerve NCV studies. F-wave and H-reflex studies generally are used to derive the time required for an electrical impulse to travel from a stimulus site on a nerve in the peripheral part of a limb, up to the spinal cord, and then back again. The motor and sensory NCV studies are designed to evaluate nerve conduction in nerves within a limb.

157.    Assuming that all other conditions of coverage are satisfied, the Fee Schedule permits lawfully licensed healthcare professionals in the metropolitan New York area to submit

34

maximum charges of: (i) $106.47 under CPT code 95089 for each sensory nerve in any limb on which NCVs test is performed; (ii) $166.47 under CPT code 95903 for each motor nerve in any limb on which NCVs test is performed; and (iii) $119.99 under CPT code 95934 for each H-Reflex test that is performed on the nerves of any limb.

158.    In an attempt to extract the maximum billing out of each Insured who supposedly received NCV tests, the PC Defendants routinely purported to test far more nerves than recommended by the Recommended Policy. Specifically, to maximize the fraudulent charges that they could submit to GEICO and other insurers, the Defendants routinely purported to perform and/or provide: (i) NCV tests of eight motor nerves; (ii) NCV tests of ten sensory nerves; as well as (iii) multiple H-reflex studies.

159.    The decision of which peripheral nerves to test in each limb and whether to test the sensory fibers, motor fibers, or both sensory and motor fibers in any such peripheral nerve must be tailored to each patient's unique circumstances.

160.    In a legitimate clinical setting, this decision is determined based upon a history and physical examination of the individual patient, as well as the real-time results obtained as the NCV tests are performed on particular peripheral nerves and their sensory and/or motor fibers. As a result, the nature and number of the peripheral nerves and the type of nerve fibers tested with NCV tests should vary from patient-to-patient.

161.    This concept is emphasized in the Recommended Policy, which states that:

> EDX studies [such as NCVs] are individually designed by the electrodiagnostic consultant for each patient.  The examination design is dynamic and often changes during the course of the study in response to new information obtained.

See Exhibit "8".

35

162. This concept also is emphasized in the CPT Assistant, which states that "Pre-set protocols automatically testing a large number of nerves are not appropriate."

163. The Defendants did not tailor the NCVs they purported to perform and/or provide to the unique circumstances of each individual Insured.

164. Instead, they applied a fraudulent "protocol" and purported to perform and/or provide NCVs on the same peripheral nerves and nerve fibers in all of the claims identified in Exhibits "1" – "7".

165. None of the NCV tests were performed to the unique circumstances of each individual Insured. Instead, they applied a fraudulent protocol and purported to perform NCVs on the same peripheral nerves and nerve fibers for virtually every insured. Specifically, the PC Defendants purported to test a combination of the following peripheral nerves and nerve fibers on almost every Insured: (i) left and right median motor nerves; (ii) left and right peroneal motor nerves; (iii) left and right tibial motor nerves; (iv) left and right ulnar motor nerves; (v) left and right median sensory nerves; (vi) left and right radial sensory nerves; (vii) left and right superficial peroneal sensory nerves; (viii) left and right sural sensory nerves; (ix) left and right median anti sensory nerves and (x) left and right ulnar sensory nerves.

166. The cookie-cutter approach to the NCVs that the PC Defendants purported to provide to Insureds clearly was not based on medical necessity. Instead, the cookie-cutter approach to the NCVs was designed solely to maximize the charges that the PC Defendants could submit to GEICO and other insurers, and to maximize their ill-gotten profits.

167. In many cases, the PC Defendants never provided the billed-for NCVs in the first instance, and instead simply compiled phony NCV test reports for the Insureds so as to make it appear as if the NCVs had been performed, when in fact they had not.

168.   NCV test results are contained in reports that display numeric values for each category of nerve measurements that are taken during NCVs test – i.e., conduction velocity, amplitude, latency, etc.

169.   The NCV reports also contain graphic waveforms, from which the numeric values for each category of nerve measurements are derived.

170.   Each waveform and numeric value is specific to a given nerve's electrical characteristics at the moment the measurement is taken.

171.   Each waveform is unique. Even if the same nerve, on the same person, was retested moments later, the resulting waveforms and data would be somewhat different.

172.   In order for the waveforms and data from two different NCV studies to be identical, the electrical currents measured at the recording electrodes affixed to each different patient would have to be identical to the microsecond for the entire duration of the test. It is physiologically impossible for this to occur even a single time.

173.   Therefore, the set of values and waveforms for each nerve that are reported in NCV reports represent the unique "fingerprints" of an patient's nerves under specific conditions at a specific moment in time.

174.   To further defraud GEICO, the Defendants routinely created and submitted NCV reports containing waveforms and numerical data that were duplicated across several patients, by copying the data from a pre-existing NCV report for one patient, then pasting it into NCV reports created for new patients. Then, they billed GEICO for these fabricated, phony NCV reports.

175.   The PC Defendants created and sent these reports to GEICO as evidence that they performed the tests and as a representation of the Insureds' medical conditions. Accordingly, each report misrepresented, among other things: (i) that the NCV test was performed; (ii) that the

37

transmitted NCV test results displayed the results of the Insureds' tests; and (iii) that the purported findings were true representations of the Insureds' respective conditions.

176.    The following are representative examples:

(i)     Ahava submitted an NCV test report supposedly administered to an Insured named V.C. The NCV test report contained right and left peroneal motor and sensory nerve data and waveforms that were an exact match for an NCV test that another medical provider allegedly performed for a different Insured named B.C.

(ii)    Ahava submitted an NCV test report supposedly administered to an Insured named V.C. The NCV test report contained right and left sural sensory nerve data and waveforms that were an exact match for an NCV test that another medical provider allegedly performed for a different Insured named B.C.

(iii)   Jamaica submitted an NCV test report for an Insured named A.G. that contained left and right median, and ulnar motor data and waveforms that were an exact match for left and right median, and ulnar motor data and waveforms in a report for an NCV that another medical provider supposedly performed for a different Insured named A.M.  The reports also contained exact matches for left and right median, radial and ulnar sensory nerve data.

(iv)    Allmed submitted an NCV test report supposedly administered to an Insured named O.J. The NCV test report contained right median and right ulnar motor nerve data and waveforms that were an exact match for an NCV test that another medical provider allegedly performed on a different Insured named V.S.

(v)     Allmed submitted an NCV test report supposedly administered to an Insured named D.D. The NCV test report contained right and left median motor nerve and F-Wave data and waveforms that were an exact match for right and left median motor nerve and F-Wave data an NCV test that another medical provider allegedly performed on a different Insured named W.A.

(vi)    Essential Medical submitted an NCV test report for an Insured named D.R. that contained an exact match for right radial, right and left ulnar sensory data and waveforms that were an exact match for an NCV test that another medical provider supposedly performed on a different Insured named S.L.

(vii)    Essential Medical submitted an NCV test report for an Insured named D.C. that contained right and left median and radial sensory data and waveforms that were an exact match for right and left median and radial sensory motor data and waveforms in a report for NCV tests that another medical provider supposedly performed on different Insured named A.M.

(viii)   Essential Medical submitted an NCV test report for an Insured named P.R. that contained right and left median and ulnar motor data and waveforms that were an exact match for right and left median and ulnar motor data and waveforms in a report for an NCV test that Lifespan supposedly performed on a different Insured named V.V. The reports also contained exact matches for left and right median, radial and ulnar sensory nerve data and waveforms.

(ix)    Jamaica Medical submitted an NCV test report for an Insured named A.R. that contained right and left median and ulnar motor, left and right median and radial sensory data and waveforms that were an exact match for right and left median and ulnar motor, left and right median and radial sensory data and waveforms in a report for NCV tests that Jamaica Medical supposedly performed on a different Insured named H.G.V.

(x)     Jamaica Medical submitted an NCV test report for an Insured named A.C. that contained right and left sural sensory data and waveforms that were an exact match for right and left sural sensory data and waveforms in a report for NCV tests that Jamaica Medical supposedly performed on a different Insured named L.V.F.

(xi)    Jamaica Medical submitted an NCV test report for an Insured named A.G. that contained right and left median and ulnar motor, right and left median and radial sensory data and waveforms that were an exact match for right and left median and ulnar motor, right and left median and radial sensory data data and waveforms in a report for NCV tests that Jamaica Medical supposedly performed on a different Insured named S.G.

(xii)   Lifespan submitted an NCV test report for an Insured named V.V. that contained right and left tibial, right and left peroneal motor, and F-Wave data and waveforms that were an exact match for right and left median motor, right and left peroneal, and F-Wave data and waveforms in a report for NCV tests that Essential Medical supposedly performed on a different Insured named C.J. The reports also contained matching right and left sural sensory nerve data and waveforms.

(xiii)  Lifespan submitted an NCV test report for an Insured named D.H. that contained right and left tibial and peroneal motor data and waveforms that were an exact match for right and left tibial and tibial motor data and

39

waveforms in a report for NCV tests that another medical provider supposedly performed on a different Insured named R.W. The reports also contained matching right and left peroneal and sural sensory nerve data and waveforms.

(xiv)    Lifespan submitted an NCV test report for an Insured named S.M. that contained right and left tibial and peroneal motor data and waveforms that were an exact match for right and left tibial and tibial motor data and waveforms in a report for NCV tests that another medical provider supposedly performed on a different Insured named J.F. The reports also contained matching right and left peroneal and sural sensory nerve data and matching H-wave data.

(xv)     Lifex submitted an NCV test report for an Insured named S.K. that contained right and left tibial and peroneal motor and left and right peroneal and sural sensory nerve data and waveforms that were an exact match for right and left tibial and peroneal motor and left and right peroneal and sural sensory nerve data and waveforms in a report for NCV tests that another medical provider supposedly performed on a different Insured named M.C.

(xvi)    Ahava submitted an NCV test report for an Insured named A.O. that contained right and left peroneal and sural sensory data and waveforms that were an exact match for right and left peroneal and sural sensory data and waveforms in a report for NCV tests that another medical provider supposedly performed on a different Insured named N.B.

(xvii)   S&R submitted an NCV test report for an Insured named G.U. that contained right and left peroneal motor, right and left tibial motor nerve and F-Wave data and waveforms that were an exact match for right and left peroneal motor, right and left tibial motor nerve and F-Wave data and waveforms in a report for NCV tests that another medical provider supposedly performed on a different Insured named P.B. The reports also contained exact matches for the left and right peroneal and sural sensory nerve data and waveforms.

(xviii)  S&R submitted an NCV test report for an Insured named G.S. that contained right and left median and ulnar motor nerve data and waveforms that were an exact match for right and left median and ulnar motor nerve data and waveforms in a report for NCV tests that Lifex supposedly performed on a different Insured named B.C. The reports also contained exact matches for left and right median, radial, sural and ulnar sensory nerves as well as left peroneal sensory nerve data and waveforms.

177.   These matches confirm that the Defendants drew from a "stock" of NCV test data that they randomly assembled and combined with the Insureds' claim information to create the impression that the NCV reports represented valid test results, when in fact they did not and, indeed, in many cases the putative NCV tests never were performed in the first instance by the PC Defendants.

178.   In addition to the specific examples described above, GEICO has identified many other instances in which the PC Defendants created phony NCV test results by cutting and pasting data and waveforms from pre-existing reports into the reports for new patients.

179.   Both the billing patterns and cookie-cutter approach show the PC Defendants did not even try to hide their deceptive fraudulent practices regarding the NCVs that the PC Defendants purported to provide to Insureds.  The NCV testing clearly was not based on medical necessity and was plainly used to inflate the billing to GEICO, and to maximize ill-gotten profits for the PC Defendants.

**3.    The Fraudulent EMGs**

180.   EMG tests involve insertion of a needle into various muscles in the spinal area ("paraspinal muscles") and in the arms and/or legs to measure electrical activity in each such muscle. The sound and appearance of the electrical activity in each muscle are compared with well-defined norms to identify the existence, nature, extent, and specific location of any abnormalities in the nerve roots, peripheral nerves, and muscles.

181.   There are many different muscles in the arms and legs that can be tested using EMGs. The decision of how many limbs and which muscles to test in each limb should be tailored to each patient's unique circumstances. In a legitimate clinical setting, this decision is

based upon a history and physical examination of each individual patient, as well as the real-time results obtained from the EMGs as they are performed on each specific muscle.

182.    As a result, the number of limbs as well as the nature and number of the muscles tested through EMGs should vary from patient-to-patient.

183.    The Defendants did not tailor the EMG tests they purported to perform and/or provide to the unique circumstances of each patient. Instead, they routinely purported to test the same muscles in the same limbs over and over again, without regard for individual patient presentation.   Additionally, on most occasions the number of muscles tested per limb were inadequate to have a complete study.

184.    Furthermore, even if there was need for any of these EMGs, the nature and number of the EMGs that the Defendants generally purported to perform and/or provide frequently grossly exceeded the maximum number of such tests – i.e., EMGs of two limbs – that should be necessary in at least 90 percent of all patients with a suspected diagnosis of radiculopathy. In most cases, The Defendants purported to perform and/or provide EMGs on four limbs, in contravention of the Recommended Policy, in order to maximize the fraudulent billing that they could submit or cause to be submitted to GEICO and other insurers.

185.    More specifically, if all other conditions of coverage are satisfied, the Fee Schedule permits lawfully licensed healthcare professionals in the metropolitan New York area to submit maximum EMG charges of: (i) $185.73 under CPT code 95860 if an EMG is performed on at least five muscles of one limb; (ii) $241.50 under CPT code 95861 if an EMG is performed on at least five muscles in each of two limbs; (iii) $314.34 under CPT code 95863 if an EMG is performed on at least five muscles in each of three limbs; and (iv) $408.64 under CPT code 95864 if an EMG is performed on at least five muscles in each of four limbs.

186.    The Defendants frequently purported to perform and/or provide EMGs on muscles in all four limbs for a large majority of Insureds solely to maximize the profits that they could reap from each such Insured.   Not only did the Defendants routinely purport to provide four-limb EMGs to Insureds, in many cases Jamaica Medical, Dr. Geris, LIfex, Dr. Yutsis, S&R and Dr. Davidov routinely unbundled their four-limb EMG charges into two separate two-limb EMG charges of $241.50 per Insured, rather than a single four-limb EMG charge of $408.64, in order to maximize their fraudulent EMG billing and conceal the fact that they were providing four-limb EMGs to Insureds in contravention of the Recommended Policy.

4.    **The Defendants' Fraudulent Radiculopathy Diagnoses**

187.    Radiculopathies are relatively rare in motor vehicle accident victims, occurring in – at most – only 19 percent of accident victims according to a large-scale, peer-reviewed 2009 study conducted by Dr. Braddom, Michael H. Rivner, M.D., and Lawrence Spitz, M.D. and published in Muscle & Nerve, the official journal of the AANEM.

188.    Furthermore, the cohort of accident victims considered in the study by Drs. Braddom, Rivner, and Spitz had been referred to a tertiary EDX testing laboratory at a major university teaching hospital, and therefore represented a more severely injured group of patients than the Insureds whom the Defendants purportedly treated.

189.    As a result, the frequency of radiculopathy in all motor vehicle accident victims – not only those who have relatively serious injuries that require referral to a major hospital EDX laboratory – is likely to be significantly lower than 19 percent.

190.    Virtually none of the Insureds whom the Defendants purported to treat suffered any serious medical problems as the result of any automobile accident, much less any radiculopathies.

191.    Even so, the PC Defendants purported to diagnose radiculopathies in the majority of the Insureds to whom they purported to provide EDX testing, despite the results of the tests not warranting a radiculopathy diagnosis.

192.    Additionally, the Defendants routinely over-diagnosed Insureds with multi-level radiculopathies, which are even rarer in automobile accident victims than single-level radiculopathies.

193.    The PC Defendants purported to arrive at their pre-determined radiculopathy diagnoses in order to create the appearance of severe injuries and thereby provide a false justification for the laundry-list of medically unnecessary Fraudulent Services that they purported to provide.

### G.    The Fraudulent Physical Therapy

194.    In addition to the other Fraudulent Services, the Defendants purported to subject most Insureds to a series of medically unnecessary physical therapy treatments.

195.    In most cases, the Defendants purported to subject each Insured to multiple physical therapy sessions over a period of several weeks, generally resulting in thousands of dollars in charges for each Insured.

196.    Like the charges for the other Fraudulent Services, the Defendants' charges for the physical therapy were fraudulent in that the physical therapy was medically unnecessary and was performed pursuant to the Defendants' pre-determined fraudulent treatment protocol and the kickbacks that the Defendants paid to the Clinics.

197.    The Defendants' charges for the physical therapy were predicated on the phony boilerplate "diagnoses" they provided to the Insureds following the initial and follow-up

44

examinations, as well as the medically useless and fraudulent EDX Tests that they purported to perform and/or provide.

198.    But for these ersatz "diagnoses" and phony EDX Tests, the PC Defendants never would have been able to submit charges for the physical therapy in the first instance, because they would have no way to justify the performance of the physical therapy.

**H.      The Fraudulent Billing for Independent Contractors**

199.    The Defendants' fraudulent scheme also included submission of claims to GEICO seeking payment for services performed by independent contractors.

200.    Under the No-Fault Laws, professional corporations are ineligible to bill for or receive payment for goods or services provided by independent contractors – the healthcare services must be provided by the professional corporations, themselves, or by their employees.

201.    Since 2001, the New York State Insurance Department consistently has reaffirmed its longstanding position that professional corporations are not entitled to receive reimbursement under the No-Fault Laws for healthcare providers performing services as independent contractors. See DOI Opinion Letter, February 21, 2001 ("where the health services are performed by a provider who is an independent contractor with the PC and is not an employee under the direct supervision of a PC owner, the PC is not authorized to bill under No-Fault as a licensed provider of those services"); DOI Opinion Letter, February 5, 2002 (refusing to modify position set forth in 2-21-01 Opinion letter despite a request from the New York State Medical Society); DOI Opinion Letter, March 11, 2002 ("If the physician has contracted with the PC as an independent contractor, and is not an employee or shareholder of the PC, such physician may not represent himself or herself as an employee of the PC eligible to bill for health services rendered on behalf of the PC, under the New York Comprehensive Motor Vehicle Insurance Reparations Act…"); DOI Opinion Letter, October

45

29, 2003 (extending the independent contractor rule to hospitals); See DOI Opinion Letter, March 21, 2005 (DOI refused to modify its earlier opinions based upon interpretations of the Medicare statute issued by the CMS) (copies of the relevant DOI Opinion letters are annexed hereto as Exhibit "9").

202.   Even so, the Defendants routinely submitted charges to GEICO and other insurers for Fraudulent Services performed by healthcare providers other than the nominal owners of the PC Defendants.

203.   To the extent that they were performed in the first instance, all of the Fraudulent Services performed by healthcare providers other than the nominal owners were performed by physicians, physical therapists, and unlicensed technicians whom the Defendants treated as independent contractors.

204.   For instance, the Defendants:

    (i)    paid the physicians, physical therapists, and unlicensed technicians, either in whole or in part, on a 1099 basis rather than a W-2 basis;

    (ii)    established an understanding with the physicians, physical therapists, and unlicensed technicians that they were independent contractors, rather than employees;

    (iii)    paid no employee benefits to the physicians, physical therapists, , and unlicensed technicians;

    (iv)    failed to secure and maintain W-4 or I-9 forms for the physicians, physical therapists, and unlicensed technicians;

    (v)    failed to withhold federal, state or city taxes on behalf of the physicians, physical therapists, and unlicensed technicians;

    (vi)    compelled the physicians, physical therapists, and unlicensed technicians to pay for their own malpractice insurance at their own expense;

    (vii)    permitted the physicians, physical therapists, and unlicensed technicians to set their own schedules and days on which they desired to perform services;

(viii)   permitted the physicians, physical therapists, and unlicensed technicians to maintain non-exclusive relationships and perform services for their own practices and/or on behalf of other medical practices;

(ix)   failed to cover the physicians, physical therapists, and unlicensed technicians for either unemployment or workers' compensation benefits; and

(x)   filed corporate and payroll tax returns (e.g. Internal Revenue Service ("IRS") forms 1120 and 941) that represented to the IRS and to the New York State Department of Taxation that the physicians, physical therapists, and unlicensed technicians were independent contractors.

205.   By electing to treat the physicians, physical therapists, and unlicensed technicians as independent contractors, the Defendants realized significant economic benefits – for instance:

(i)   avoiding the obligation to collect and remit income tax as required by 26 U.S.C. § 3102;

(ii)   avoiding payment of the FUTA excise tax required by 26 U.S.C. § 3301 (6.2 percent of all income paid);

(iii)   avoiding payment of the FICA excise tax required by 26 U.S.C. § 3111 (7.65 percent of all income paid);

(iv)   avoiding payment of workers' compensation insurance as required by New York Workers' Compensation Law § 10;

(v)   avoiding the need to secure any malpractice insurance; and

(vi)   avoiding claims of agency-based liability arising from work performed by the physicians, physical therapists, and unlicensed technicians.

206.   Because the physicians, physical therapists, and unlicensed technicians were independent contractors and performed the Fraudulent Services, the Defendants never had any right to bill for or collect No-Fault Benefits in connection with those services.

207.   The Defendants billed for the Fraudulent Services as if they were provided by actual employees of the Defendants to make it appear as if the services were eligible for reimbursement.

The PC Defendants' misrepresentations were consciously designed to mislead GEICO into believing that it was obligated to pay for these services, when in fact GEICO was not.

**III.   The Fraudulent Billing the Defendants Submitted to GEICO**

208.   To support their fraudulent charges, the Defendants systematically submitted or caused to be submitted thousands of NF-3 forms, HCFA-1500 forms, and/or treatment reports to GEICO seeking payment for the Fraudulent Services for which the Defendants were not entitled to receive payment.

209.   The NF-3 forms, HCFA-1500 forms, and treatment reports submitted to GEICO by and on behalf of the Defendants were false and misleading in the following material respects:

(i)     The NF-3 forms, HCFA-1500 forms, and treatment reports submitted by and on behalf of the Defendants uniformly misrepresented to GEICO that the Fraudulent Services were medically necessary and, in many cases, misrepresented to GEICO that the Fraudulent Services actually were performed. In fact, the Fraudulent Services were not medically necessary, in many cases were not actually performed, and were performed – to the extent that they were performed at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them.

(ii)    The NF-3 forms, HCFA-1500 forms, and treatment reports submitted by and on behalf of the Defendants uniformly misrepresented and exaggerated the level of the Fraudulent Services and the nature of the Fraudulent Services that purportedly were provided.

(iii)   The NF-3 forms, HCFA-1500 forms, and treatment reports submitted by and on behalf of the Defendants uniformly misrepresented to GEICO that the PC Defendants were in compliance with all material licensing laws and, therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12).  In fact, the PC Defendants were not in compliance with all material licensing laws in that they paid kickbacks for patient referrals.

(iv)    The NF-3 forms, HCFA-1500 forms, and treatment reports submitted by and on behalf of the Defendants uniformly misrepresented to GEICO that the PC Defendants were eligible to receive No-Fault Benefits pursuant to

Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.11 for the services that supposedly were performed. In fact, the PC Defendants were not eligible to seek or pursue collection of No-Fault Benefits for many of the services that supposedly were performed because the services were not provided by the PC Defendants' employees.

## IV.   The Defendants' Fraudulent Concealment and GEICO's Justifiable Reliance

210.   The Defendants legally and ethically were obligated to act honestly and with integrity in connection with the billing that they submitted, or caused to be submitted, to GEICO.

211.   To induce GEICO to promptly pay the fraudulent charges for the Fraudulent Services, the Defendants systemically concealed their fraud and went to great lengths to accomplish this concealment.

212.   Specifically, they knowingly misrepresented and concealed facts related to the PC Defendants in an effort to prevent discovery that the Defendants unlawfully paid kickbacks for patient referrals.

213.   Furthermore, the Defendants knowingly misrepresented and concealed facts in order to prevent GEICO from discovering that the Fraudulent Services were medically unnecessary and performed pursuant to a fraudulent pre-determined protocol designed to maximize the charges that could be submitted.

214.   In addition, the Defendants knowingly misrepresented and concealed facts related to the employment status of the physicians, physical therapists, acupuncturists, and technicians associated with the Defendants in order to prevent GEICO from discovering that the physicians, physical therapists, and technicians performing many of the Fraudulent Services – to the extent that they were performed at all – were not employed by the PC Defendants.

215.   GEICO maintains standard office practices and procedures that are designed to and do ensure that no-fault claim denial forms or requests for additional verification of no-fault

49

claims are properly addressed and mailed in a timely manner in accordance with the No-Fault Laws.

216.   In accordance with the No-Fault Laws, and GEICO's standard office practices and procedures, GEICO either: (i) timely and appropriately denied the pending claims for No-Fault Benefits submitted by or on behalf of the Defendants; or (ii) timely issued requests for additional verification with respect to all of the pending claims for No-Fault Benefits submitted through the defendants (yet GEICO failed to obtain compliance with the requests for additional verification), and, therefore, GEICO's time to pay or deny the claims has not yet expired.

217.   The Defendants hired law firms to pursue collection of the fraudulent charges from GEICO and other insurers. These law firms routinely filed expensive and time-consuming litigation against GEICO and other insurers if the charges were not promptly paid in full.

218.   GEICO is under statutory and contractual obligations to promptly and fairly process claims within 30 days. The facially-valid documents submitted to GEICO in support of the fraudulent charges at issue, combined with the material misrepresentations and fraudulent litigation activity described above, were designed to and did cause GEICO to rely upon them. As a result, GEICO incurred damages of more than $4,074,000.00 based upon the fraudulent charges.

219.   Based upon the Defendants' material misrepresentations and other affirmative acts to conceal their fraud from GEICO, GEICO did not discover and could not reasonably have discovered that its damages were attributable to fraud until shortly before it filed this Complaint.

## FIRST CAUSE OF ACTION AGAINST THE PC DEFENDANTS
### (Declaratory Judgment – 28 U.S.C. §§ 2201 and 2202)

220.   GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 219 above.

221.    There is an actual case in controversy between GEICO and the PC Defendants as to more than $3,460,000.00 in pending fraudulent charges for the Fraudulent Services that have not been paid.

222.    The PC Defendants have no right to receive payment for any pending bills submitted to GEICO for the Fraudulent Services because the Fraudulent Services were not medically necessary and in many cases were not performed in the first instance.

223.    The PC Defendants have no right to receive payment for any pending bills submitted to GEICO because the Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them.

224.    The PC Defendants have no right to receive payment for any pending bills submitted to GEICO because, in many cases, the Fraudulent Services never were provided in the first instance.

225.    The PC Defendants have no right to receive payment for any pending bills submitted to GEICO because the billing codes used for the Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

226.    The PC Defendants have no right to receive payment for any pending bills submitted to GEICO because the Fraudulent Services were provided – to the extent that they were provided at all – pursuant to illegal kickback arrangements between the PC Defendants and others.

227.   The PC Defendants have no right to receive payment for any pending bills submitted to GEICO because, in many cases, the Fraudulent Services – to the extent that they were provided at all – were provided by independent contractors, rather than by the PC Defendants' employees.

228.   Accordingly, GEICO requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that the PC Defendants have no right to receive payment for any pending bills submitted to GEICO because:

(i)      the Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them;

(ii)     in many cases, the Fraudulent Services never were provided in the first instance;

(iii)    the billing codes used for the Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO;

(iv)    the Fraudulent Services were provided – to the extent that they were provided at all – pursuant to illegal kickback arrangements between the PC Defendants and others; and

(v)     in many cases, the Fraudulent Services – to the extent that they were provided at all – were provided by independent contractors, rather than by the PC Defendants' employees.

## SECOND CAUSE OF ACTION AGAINST MAYARD
### (Violation of 18 U.S.C. § 1962(c))

229.   GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 228 above.

230.   Ahava Medical, P.C. is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affects interstate commerce.

231.    Mayard knowingly has conducted and/or participated, directly or indirectly, in the conduct of Ahava's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent bills on a continuous basis for over seven years seeking payments that Ahava was not entitled to receive under the No-Fault Laws because the bills misrepresented and exaggerated the level and nature of the Fraudulent Services that were provided, and because the billed-for Fraudulent Services were not medically necessary, were performed and billed pursuant to a pre-determined, fraudulent treatment and billing protocol designed solely to enrich the Defendants, were performed and billed pursuant to kickbacks, were performed by independent contractors rather than by Ahava employees, and in many cases were not performed at all. A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "1".

232.    Ahava's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Mayard operates Ahava, insofar as Ahava is not engaged in a legitimate medical practice, and acts of mail fraud therefore are essential in order for Ahava to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that the Defendants continue to attempt collection on the fraudulent billing submitted through Ahava to the present day.

233.    Ahava is engaged in inherently unlawful acts, inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to GEICO and other insurers. These

inherently unlawful acts are taken by Ahava in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent No-Fault billing.

234.   GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $517,000.00 pursuant to the fraudulent bills submitted through Ahava.

235.   By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

## THIRD CAUSE OF ACTION AGAINST AHAVA AND MAYARD
(Common Law Fraud)

236.   GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 235 above.

237.   Ahava and Mayard intentionally and knowingly made false and fraudulent statements of material fact to GEICO by submitting, or causing to be submitted, hundreds of fraudulent bills for the Fraudulent Services.

238.   The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that the Fraudulent Services were medically necessary, when in fact they were not; (ii) in every claim, the representation that Ahava was properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12), when in fact it paid kickbacks for patient referrals; (iii) in many claims, the representation that the Fraudulent Services were provided in the first instance, when in fact they were not; and (iv) in every claim for services provided by

54

anyone other than Mayard, the representation that the services were performed by Ahava's employees, when in fact they were not.

239.     Ahava and Mayard made false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges that were not compensable under the No-Fault Laws.

240.     GEICO justifiably relied on the Defendants' false and fraudulent representations, and, as a proximate result, have incurred damages of more than $517,000.00 based upon the fraudulent charges.

241.     Ahava's and Mayard's extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

242.     Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

### FOURTH CAUSE OF ACTION AGAINST AHAVA AND MAYARD
(Unjust Enrichment)

243.     GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 242 above.

244.     As set forth above, the Defendants have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

245.     When GEICO paid the bills and charges submitted by or on behalf of Ahava for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on the Defendants' improper, unlawful, and/or unjust acts.

246.   The Defendants have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that the Defendants voluntarily accepted and distributed amongst themselves notwithstanding their improper, unlawful, and unjust billing scheme.

247.   The Defendants' retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

248.   By reason of the above, the Defendants have been unjustly enriched in an amount to be determined at trial, but in no event less than the total sum of $517,000.00.

## FIFTH CAUSE OF ACTION AGAINST ALLMED
(Common Law Fraud)

249.   GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 248 above.

250.   Allmed intentionally and knowingly made false and fraudulent statements of material fact to GEICO by submitting, or causing to be submitted, hundreds of fraudulent bills for the Fraudulent Services.

251.   The false and fraudulent statements of material fact and acts of fraudulent concealment include: The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that the Fraudulent Services were medically necessary, when in fact they were not; (ii) in every claim, the representation that Allmed was properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12), when in fact it paid kickbacks for patient referrals; (iii) in many claims, the representation that the Fraudulent Services were provided in the first instance, when in fact they were not; and (iv) in every claim for services provided by

anyone other than its nominal owner, Dr. Michael Bley, the representation that the services were performed by Allmed's employees, when in fact they were not.

252.    Allmed made false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges that were not compensable under the No-Fault Laws.

253.    GEICO justifiably relied on the Defendants' false and fraudulent representations, and, as a proximate result, have incurred damages of more than $448,000.00 based upon the fraudulent charges.

254.    Allmed's extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

255.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

## SIXTH CAUSE OF ACTION AGAINST ALLMED
(Unjust Enrichment)

256.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 255 above.

257.    As set forth above, the Defendants have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

258.    When GEICO paid the bills and charges submitted by or on behalf of Allmed for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on the Defendants' improper, unlawful, and/or unjust acts.

259.     The Defendants have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that the Defendants voluntarily accepted and distributed amongst themselves notwithstanding their improper, unlawful, and unjust billing scheme.

260.     The Defendants' retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

261.     By reason of the above, the Defendants have been unjustly enriched in an amount to be determined at trial, but in no event less than the total sum of $448,000.00.

## SEVENTH CAUSE OF ACTION AGAINST DR. NAM
(Violation of 18 U.S.C. § 1962(c))

262.     GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 261 above.

263.     Essential Medical, P.C. is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affects interstate commerce.

264.     Dr. Nam knowingly has conducted and/or participated, directly or indirectly, in the conduct of Essential's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent bills on a continuous basis for over six years seeking payments that Essential was not entitled to receive under the No-Fault Laws because the bills misrepresented and exaggerated the level and nature of the Fraudulent Services that were provided, and because the billed-for Fraudulent Services were not medically necessary, were performed and billed pursuant to a pre-determined, fraudulent treatment and billing protocol designed solely to enrich the Defendants, were performed and billed pursuant to kickbacks, were performed by independent contractors rather than by Essential's employees, and

in many cases were not performed at all.  A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "3".

265.    Essential's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Dr. Nam operates Essential, insofar as Essential is not engaged in a legitimate medical practice, and acts of mail fraud therefore are essential in order for Essential to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that the Defendants continue to attempt collection on the fraudulent billing submitted through Essential to the present day.

266.    Essential is engaged in inherently unlawful acts, inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by Essential in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent No-Fault billing.

267.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $631,000.00 pursuant to the fraudulent bills submitted through Essential.

268.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

## EIGHTH CAUSE OF ACTION AGAINST DR. NAM AND ESSENTIAL
(Common Law Fraud)

269.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 268 above.

270.    Nam and Essential intentionally and knowingly made false and fraudulent statements of material fact to GEICO by submitting, or causing to be submitted, hundreds of fraudulent bills for the Fraudulent Services.

271.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that the Fraudulent Services were medically necessary, when in fact they were not; (ii) in every claim, the representation that Essential was properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12), when in fact it paid kickbacks for patient referrals; (iii) in many claims, the representation that the Fraudulent Services were provided in the first instance, when in fact they were not; and (iv) in every claim for services provided by anyone other than Dr. Nam, the representation that the services were performed by Essential's employees, when in fact they were not.

272.    Dr. Nam and Essential made false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges that were not compensable under the No-Fault Laws.

273.    GEICO justifiably relied on the Defendants' false and fraudulent representations, and, as a proximate result, have incurred damages of more than $631,000.00 based upon the fraudulent charges.

60

274.    Dr. Nam's and Essential's extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

275.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

## NINTH CAUSE OF ACTION AGAINST DR. NAM AND ESSENTIAL
(Unjust Enrichment)

276.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 275 above.

277.    As set forth above, the Defendants have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

278.    When GEICO paid the bills and charges submitted by or on behalf of Essential for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on the Defendants' improper, unlawful, and/or unjust acts.

279.    The Defendants have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that Defendants voluntarily accepted and distributed amongst themselves notwithstanding their improper, unlawful, and unjust billing scheme.

280.    The Defendants' retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

281.    By reason of the above, the Defendants have been unjustly enriched in an amount to be determined at trial, but in no event less than the total sum of $631,000.00.

## TENTH CAUSE OF ACTION AGAINST DR. GERIS
### (Violation of 18 U.S.C. § 1962(c))

282.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 281 above.

283.    Jamaica Medical, P.C. is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affects interstate commerce.

284.    Dr. Geris knowingly has conducted and/or participated, directly or indirectly, in the conduct of Jamaica Medical's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent bills on a continuous basis for over six years seeking payments that Jamaica Medical was not entitled to receive under the No-Fault Laws because the bills misrepresented and exaggerated the level and nature of the Fraudulent Services that were provided, and because the billed-for Fraudulent Services were not medically necessary, were performed and billed pursuant to a pre-determined, fraudulent treatment and billing protocol designed solely to enrich the Defendants, were performed and billed pursuant to kickbacks, were performed by independent contractors rather than by Jamaica Medical employees, and in many cases were not performed at all. A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "4".

285.    Jamaica Medical's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Dr. Geris operates Jamaica Medical, insofar as Jamaica

Medical is not engaged in a legitimate medical practice, and acts of mail fraud therefore are essential in order for Jamaica Medical to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that the Defendants continue to attempt collection on the fraudulent billing submitted through Jamaica Medical to the present day.

286.    Jamaica Medical is engaged in inherently unlawful acts, inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by Jamaica Medical in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent No-Fault billing.

287.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $712,000.00 pursuant to the fraudulent bills submitted through Jamaica Medical.

288.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

## ELEVENTH CAUSE OF ACTION AGAINST DR. GERIS AND JAMAICA MEDICAL
(Common Law Fraud)

289.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 288 above.

290.    Dr. Geris and Jamaica Medical intentionally and knowingly made false and fraudulent statements of material fact to GEICO by submitting, or causing to be submitted, hundreds of fraudulent bills for the Fraudulent Services.

63

291. The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that the Fraudulent Services were medically necessary, when in fact they were not; (ii) in every claim, the representation that Jamaica Medical was properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12), when in fact it paid kickbacks for patient referrals; (iii) in many claims, the representation that the Fraudulent Services were provided in the first instance, when in fact they were not; and (iv) in every claim for services provided by anyone other than Dr. Geris, the representation that the services were performed by Jamaica Medical's employees, when in fact they were not.

292. Dr. Geris and Jamaica Medical made false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges that were not compensable under the No-Fault Laws.

293. GEICO justifiably relied on the Defendants' false and fraudulent representations, and, as a proximate result, have incurred damages of more than $712,000.00 based upon the fraudulent charges.

294. Dr. Geris' and Jamaica Medical's extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

295. Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

## TWELFTH CAUSE OF ACTION AGAINST DR. GERIS AND JAMAICA MEDICAL
(Unjust Enrichment)

296.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 295 above.

297.    As set forth above, the Defendants have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

298.    When GEICO paid the bills and charges submitted by or on behalf of Jamaica Medical for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on the Defendants' improper, unlawful, and/or unjust acts.

299.    The Defendants have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that Defendants voluntarily accepted and distributed amongst themselves notwithstanding their improper, unlawful, and unjust billing scheme.

300.    The Defendants' retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

301.    By reason of the above, the Defendants have been unjustly enriched in an amount to be determined at trial, but in no event less than the total sum of $712,000.00.

## THIRTEENTH CAUSE OF ACTION AGAINST DR. NAM
(Violation of 18 U.S.C. § 1962(c))

302.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 301 above.

303.    Lifespan Medical, P.C. is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affects interstate commerce.

304.    Dr. Nam knowingly has conducted and/or participated, directly or indirectly, in the conduct of Lifespan's affairs through a pattern of racketeering activity consisting of repeated

violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent bills on a continuous basis for over six years seeking payments that Lifespan was not entitled to receive under the No-Fault Laws because the bills misrepresented and exaggerated the level and nature of the Fraudulent Services that were provided, and because the billed-for Fraudulent Services were not medically necessary, were performed and billed pursuant to a pre-determined, fraudulent treatment and billing protocol designed solely to enrich the Defendants, were performed and billed pursuant to kickbacks, were performed by independent contractors rather than by Lifespan employees, and in many cases were not performed at all. A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "5".

305.    Lifespan's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Nam operates Lifespan, insofar as Lifespan is not engaged in a legitimate medical practice, and acts of mail fraud therefore are essential in order for Lifespan to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that the Defendants continue to attempt collection on the fraudulent billing submitted through Lifespan to the present day.

306.    Lifespan is engaged in inherently unlawful acts, inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by Lifespan in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent No-Fault billing.

307.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $234,000.00 pursuant to the fraudulent bills submitted through Lifespan.

308.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

## FOURTEENTH CAUSE OF ACTION AGAINST LIFESPAN AND DR. NAM
(Common Law Fraud)

309.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 308 above.

310.    Dr. Nam and Lifespan intentionally and knowingly made false and fraudulent statements of material fact to GEICO by submitting, or causing to be submitted, hundreds of fraudulent bills for the Fraudulent Services.

311.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that the Fraudulent Services were medically necessary, when in fact they were not; (ii) in every claim, the representation that Lifespan was properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12), when in fact it paid kickbacks for patient referrals; (iii) in many claims, the representation that the Fraudulent Services were provided in the first instance, when in fact they were not; and (iv) in every claim for services provided by anyone other than Dr. Nam, the representation that the services were performed by Lifespan's employees, when in fact they were not.

312.    Dr. Nam and Lifespan made false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges that were not compensable under the No-Fault Laws.

313.    GEICO justifiably relied on the Defendants' false and fraudulent representations, and, as a proximate result, has incurred damages of more than $234,000.00 based upon the fraudulent charges.

314.    Dr. Nam's and Lifespan's extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

315.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

## FIFTEENTH CAUSE OF ACTION AGAINST LIFESPAN AND DR. NAM
(Unjust Enrichment)

316.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 315 above.

317.    As set forth above, the Defendants have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

318.    When GEICO paid the bills and charges submitted by or on behalf of Lifespan for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on the Defendants' improper, unlawful, and/or unjust acts.

319.    The Defendants have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that Defendants voluntarily accepted and distributed amongst themselves notwithstanding their improper, unlawful, and unjust billing scheme.

320.    The Defendants' retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

321.    By reason of the above, the Defendants have been unjustly enriched in an amount to be determined at trial, but in no event less than the total sum of $234,000.00.

## SIXTEENTH CAUSE OF ACTION AGAINST DR. YUTSIS
(Violation of 18 U.S.C. § 1962(c))

322.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 321 above.

323.    Lifex Medical, P.C. is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affects interstate commerce.

324.    Dr. Yutsis knowingly has conducted and/or participated, directly or indirectly, in the conduct of Lifex's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent bills on a continuous basis for over seven years seeking payments that Lifex was not entitled to receive under the No-Fault Laws because the bills misrepresented and exaggerated the level and nature of the Fraudulent Services that were provided, and because the billed-for Fraudulent Services were not medically necessary, were performed and billed pursuant to a pre-determined, fraudulent treatment and billing protocol designed solely to enrich the Defendants, were performed and billed pursuant to kickbacks, were performed by independent contractors rather than by Lifex employees, and in

69

many cases were not performed at all. A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "6".

325.    Lifex's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Dr. Yutsis operates Lifex, insofar as Lifex is not engaged in a legitimate medical practice, and acts of mail fraud therefore are essential in order for Lifex to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that the Defendants continue to attempt collection on the fraudulent billing submitted through Lifex to the present day.

326.    Lifex is engaged in inherently unlawful acts, inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by Lifex in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent No-Fault billing.

327.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $365,000.00 pursuant to the fraudulent bills submitted through Lifex.

328.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

## SEVENTEENTH CAUSE OF ACTION AGAINST LIFEX AND DR. YUTSIS
(Common Law Fraud)

329.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 328 above.

330.    Dr. Yutsis and Lifex intentionally and knowingly made false and fraudulent statements of material fact to GEICO by submitting, or causing to be submitted, hundreds of fraudulent bills for the Fraudulent Services.

331.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that the Fraudulent Services were medically necessary, when in fact they were not; (ii) in every claim, the representation that Lifex was properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12), when in fact it paid kickbacks for patient referrals; (iii) in many claims, the representation that the Fraudulent Services were provided in the first instance, when in fact they were not; and (iv) in every claim for services provided by anyone other than Dr. Yutsis, the representation that the services were performed by Lifex's employees, when in fact they were not.

332.    Dr. Yutsis and Lifex made false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges that were not compensable under the No-Fault Laws.

333.    GEICO justifiably relied on the Defendants' false and fraudulent representations, and, as a proximate result, have incurred damages of more than $365,000.00 based upon the fraudulent charges.

334.    Dr. Yutsis's and Lifex's extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

335.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

## EIGHTEENTH CAUSE OF ACTION AGAINST LIFEX AND DR. YUTSIS
(Unjust Enrichment)

336.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 335 above.

337.    As set forth above, the Defendants have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

338.    When GEICO paid the bills and charges submitted by or on behalf of Lifex for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on the Defendants' improper, unlawful, and/or unjust acts.

339.    The Defendants have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that Defendants voluntarily accepted and distributed amongst themselves notwithstanding their improper, unlawful, and unjust billing scheme.

340.    The Defendants' retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

341.    By reason of the above, the Defendants have been unjustly enriched in an amount to be determined at trial, but in no event less than the total sum of $365,000.00.

## NINETEENTH CAUSE OF ACTION AGAINST DR. DAVIDOV
(Violation of 18 U.S.C. § 1962(c))

72

342.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 341 above.

343.    S&R Medical, P.C. is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affects interstate commerce.

344.    Dr. Davidov knowingly has conducted and/or participated, directly or indirectly, in the conduct of S&R's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent bills on a continuous basis for over ten years seeking payments that S&R was not entitled to receive under the No-Fault Laws because the bills misrepresented and exaggerated the level and nature of the Fraudulent Services that were provided, and because the billed-for Fraudulent Services were not medically necessary, were performed and billed pursuant to a pre-determined, fraudulent treatment and billing protocol designed solely to enrich the Defendants, were performed and billed pursuant to kickbacks, were performed by independent contractors rather than by S&R employees, and in many cases were not performed at all. A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "7".

345.    S&R's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Dr. Davidov operates S&R, insofar as S&R is not engaged in a legitimate medical practice, and acts of mail fraud therefore are essential in order for S&R to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail

73

fraud implies a threat of continued criminal activity, as does the fact that the Defendants continue to attempt collection on the fraudulent billing submitted through S&R to the present day.

346.   S&R is engaged in inherently unlawful acts, inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by S&R in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent No-Fault billing.

347.   GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $1,800,000.00 pursuant to the fraudulent bills submitted through S&R.

348.   By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

## TWENTIETH CAUSE OF ACTION AGAINST S&R AND DR. DAVIDOV
(Common Law Fraud)

349.   GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 348 above.

350.   Dr. Davidov and S&R intentionally and knowingly made false and fraudulent statements of material fact to GEICO by submitting, or causing to be submitted, hundreds of fraudulent bills for the Fraudulent Services.

351.   The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that the Fraudulent Services were medically necessary, when in fact they were not; (ii) in every claim, the representation that S&R was properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance

Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12), when in fact it paid kickbacks for patient referrals; (iii) in many claims, the representation that the Fraudulent Services were provided in the first instance, when in fact they were not; and (iv) in every claim for services provided by anyone other than Dr. Davidov, the representation that the services were performed by S&R's employees, when in fact they were not.

352.    Dr. Davidov and S&R made false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges that were not compensable under the No-Fault Laws.

353.    GEICO justifiably relied on the Defendants' false and fraudulent representations, and, as a proximate result, have incurred damages of more than $1,800,000.00 based upon the fraudulent charges.

354.    Dr. Davidov's and S&R's extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

355.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

### TWENTY-FIRST CAUSE OF ACTION AGAINST S&R AND DR. DAVIDOV
(Unjust Enrichment)

356.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 355 above.

357.    As set forth above, the Defendants have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

358.   When GEICO paid the bills and charges submitted by or on behalf of S&R for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on the Defendants' improper, unlawful, and/or unjust acts.

359.   The Defendants have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that Defendants voluntarily accepted and distributed amongst themselves notwithstanding their improper, unlawful, and unjust billing scheme.

360.   The Defendants' retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

361.   By reason of the above, the Defendants have been unjustly enriched in an amount to be determined at trial, but in no event less than the total sum of $1,800,000.00.

## JURY DEMAND

362.   Pursuant to Federal Rule of Civil Procedure 38(b), GEICO demands a trial by jury.

**WHEREFORE**, Plaintiff GEICO Insurance Company demands that a Judgment be entered in its favor:

A.   On the First Cause of Action, declaring that the PC Defendants have no right to receive payment for any pending bills submitted to GEICO;

B.   On the Second Cause of Action against Mayard, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $517,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest; and

C.   On the Third Cause of Action against Mayard and Ahava, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $517,000.00, together

with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

D.      On the Fourth Cause of Action against Mayard and Ahava, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $517,000.00, plus costs and interest and such other and further relief as this Court deems just and proper;

E.      On the Fifth Cause of Action against Allmed, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $448,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

F.      On the Sixth Cause of Action against Allmed, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $448,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

G.      On the Seventh Cause of Action against Dr. Nam, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $631,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest; and

H.      On the Eighth Cause of Action against Dr. Nam and Essential, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $631,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

I.      On the Ninth Cause of Action against Dr. Nam and Essential, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $631,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

J.      On the Tenth Cause of Action against Dr. Geris, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $712,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest; and

K.      On the Eleventh Cause of Action against Dr. Geris and Jamaica Medical, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $712,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

L.      On the Twelfth Cause of Action against Dr. Geris and Jamaica Medical, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $712,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

M.      On the Thirteenth Cause of Action against Dr. Nam, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $234,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest; and

N.      On the Fourteenth Cause of Action against Dr. Nam and Lifespan, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $234,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

O.      On the Fifteenth Cause of Action against Dr. Nam and Lifespan, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $234,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

P.      On the Sixteenth Cause of Action against Dr. Yutsis, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $365,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest; and

Q.      On the Seventeenth Cause of Action against Dr. Yutsis and Lifex, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $365,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

R.      On the Eighteenth Cause of Action against Dr. Yutsis and Lifex, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $325,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

S.      On the Nineteenth Cause of Action against Dr. Davidov, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $1,800,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest; and

T.      On the Twentieth Cause of Action against Dr. Davidov and S&R, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $1,800,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

U.      On the Twenty-First Cause of Action against Dr. Davidov and S&R, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of

$1,800,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

Dated:      Uniondale, New York
                 July 10, 2015

                                 RIVKIN RADLER LLP

                                 By:_____
                                   Barry I. Levy (BL 2190)
                                 Michael A. Sirignano (MS 5263)
                                 Ryan Goldberg (RG 7570)
                              926 RXR Plaza
                              Uniondale, New York 11556-0926
                              Telephone:    (516) 357-3000
                              Facsimile:    (516) 357-3333

*Counsel for Plaintiffs, Government Employees Insurance Co., GEICO Indemnity Co., GEICO General Insurance Company and GEICO Casualty Co.*

80