1                   UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF NEW YORK
2
    ------------------------------------x
3   GOVERNMENT EMPLOYEES INSURANCE CO.,
    et al.,
4
                        Plaintiffs,      15-CV-4077 (CBA)
5
    - against -                          United States Courthouse
6                                        Brooklyn, New York
    GRACIA MAYARD, et al.,
7
                        Defendants.
8   ------------------------------------x

9                                        February 4, 2016
                                         2:11 p.m.
10

11           TRANSCRIPT OF CIVIL CAUSE FOR CONFERENCE
              BEFORE THE HONORABLE CAROL BAGLEY AMON
12               CHIEF UNITED STATES DISTRICT JUDGE

13  APPEARANCES:
    For the Plaintiffs:
14                           RIVKIN RADLER LLP
                             926 RXR Plaza
15                           Uniondale, New York 11556-0926

16                           BY:  MICHAEL A. SIRIGNANO, ESQ.
                                  RYAN C. GOLDBERG, ESQ.
17
    For the Defendant S&R Medical
18          and Yvette Davidov:
                             ABRAMS FENSTERMAN
19                           630 Third Avenue - 5th Floor
                             New York, New York 10017
20
                             BY:  MARK L. FURMAN, ESQ.
21
    Court Reporter:          Georgette K. Betts, CSR, RPR
22                           225 Cadman Plaza East
                             Brooklyn, New York
23                           Phone:  (718)804-2777

24  Proceedings recorded by mechanical stenography, transcript
    produced by computer-aided transcription.
25

1          THE LAW CLERK:  Government Employees Insurance

2    Company versus Mayard, 15-CV-4077.

3          THE COURT:  Would the parties please state their

4    appearances for the record.  First for the plaintiffs.

5          MR. SIRIGNANO:  Good afternoon, Your Honor, Michael

6    Sirignano from Rivkin Radler representing the GEICO companies.

7          MR. GOLDBERG:  Ryan Goldberg, Rivkin Radler

8    representing GEICO.

9          THE COURT:  Good afternoon.

10          MR. GOLDBERG:  Good afternoon.

11          THE COURT:  For defendants.

12          MR. FURMAN:  For the defendants, S&R Medical, P.C.

13    and Yvette Davidov the movants in this case, Mark Furman for

14    the Abrams Fensterman firm.

15          THE COURT:  Mr. Furman, you're seeking two things I

16    guess, which is the dismissal of the complaint and/or sever

17    S&R Medical and Dr. Davidov from the rest of the defendants,

18    correct?

19          MR. FURMAN:  That's correct.

20          THE COURT:  Let me just ask plaintiff's counsel, in

21    the complaint you set forth each doctor and company as a

22    separate enterprise, why are all of these -- what have you set

23    forth to link all of these doctors and all of these, what you

24    admittedly identified as separate enterprises, together in one

25    complaint?  Why should they be in one complaint?

1          MR. SIRIGNANO:  Your Honor, generally speaking, for

2     two reasons.  First, the complaint alleges an interrelated

3     scheme involving essentially the same treatment and billing

4     scheme, all involving similar types of professional

5     corporations that are operating without maintaining a

6     stand-alone practice, providers --

7          THE COURT:  Well, a lot of people engage in the same

8     kind of fraud, what links --

9          MR. SIRIGNANO:  Yes, Your Honor.

10          THE COURT:  -- these people together?

11          MR. SIRIGNANO:  What links them together is

12     primarily the identical nature of the fraud.  It's not just

13     the fact that there's some similarities, they are involved in

14     the same exact treatment and billing protocols at the same

15     type of locations involving the same kickback arrangements.

16     And in addition to that, some of the treatment at issue,

17     particularly the diagnostic testing, the EMG/NCV testing, that

18     fraudulent treatment in addition to being identical, is based

19     on a similar -- a single stock of data.  These providers,

20     including S&R Medical, draws from that stock of data and in

21     many instances we've identified instances where the NCV

22     portion of the EMG report is simply copied and pasted from

23     this stock of data.

24          THE COURT:  By different medical practices?

25          MR. SIRIGNANO:  Yes, and there's overlap between --

1    in one instance we've identified at least S&R basically has

2    the same -- it's a copied report.  They are impossible to be

3    legitimate reports based on expert --

4                THE COURT:  Who submitted the same report, which

5    other entity?

6                MR. SIRIGNANO:  S&R submitted a report that was

7    identical to at least one of the other entities in the case,

8    Lifex.

9                THE COURT:  So you've got the fact that they -- S&R

10   with one other entity has used a common report, and what's

11   that other entity?

12               MR. SIRIGNANO:  Lifex, Your Honor, which is one of

13   the other --

14               THE COURT:  I'm not seeing them as one.

15               MR. SIRIGNANO:  Lifex Medical Care, P.C., which is

16   one of the other defendants.

17               THE COURT:  I see.  So two defendants use the same

18   report.

19               MR. SIRIGNANO:  Some of the other defendants also

20   have interchangeable reports and we identified in the

21   complaint a whole series of those.

22               THE COURT:  Where?

23               MR. SIRIGNANO:  Paragraph 176 there's a whole series

24   of reports of examples of NCV reports that are drawn from this

25   stock of data that are copied and pasted among each other and

GEORGETTE K. BETTS, RPR, CSR, OCR

1   other professional corporations.  But there are matches among

2   a number of the defendants in this case.

3              THE COURT:  So Ahava -- by the way, none of these

4   other defendants are moving to dismiss, right?  Have they all

5   been served?

6              MR. SIRIGNANO:  No, they haven't, and actually

7   that's another reason for keeping all these defendants

8   together.  Six of the 12 are already either in default or have

9   settled with GEICO.  There's really only two groups remaining,

10  Mr. Furman's clients and one other doctor and his professional

11  corporation.

12             THE COURT:  Who settled?

13             MR. SIRIGNANO:  Gracia Mayard and Ahava Medical.

14  And then --

15             THE COURT:  Who has not answered?  Anybody else

16  settled?

17             MR. SIRIGNANO:  AllMed Medical of Williamsburg is in

18  default; Billy Geris, M.D. is in default; Jamaica Medical

19  Plaza, P.C. is in default.

20             THE COURT:  Have you moved for default?

21             MR. SIRIGNANO:  We've obtained clerk's certificates

22  of default, yes, Your Honor.

23             Pavel Yutsis is in default.  Lifex Medical Care is

24  in default.  And so there are essentially five remaining

25  defendants that fall into two groups.  We are actively in

1  negotiations with Dr. Nam and his two professional

2  corporations.  And then the other group is Dr. Davidov and her

3  professional corporation, S&R Medical.

4          THE COURT:  When you say Nam is in settlement, what

5  are his groups?

6          MR. SIRIGNANO:  Essential Medical Care, P.C. is

7  linked up with Dr. Nam and Life Span Medical, P.C.

8          THE COURT:  Both of those are his?

9          MR. SIRIGNANO:  Yes.

10          THE COURT:  What's going on with Mayard -- you said,

11  I'm sorry, Mayard and Ahava Medical, did you say settled?

12          MR. SIRIGNANO:  They are settled, yes, Your Honor.

13          THE COURT:  So as a practical matter, the only one

14  left litigating this is S&R Medical.

15          MR. SIRIGNANO:  At this point the only party that is

16  actively litigating is S&R Medical and its alleged owner,

17  Yvette Davidov.  The other defendants are in negotiations with

18  us, so --

19          THE COURT:  Did you discuss the issue -- have the

20  two sides here discussed the issue of settlement?

21          MR. SIRIGNANO:  We have.  We indicated -- well

22  settlement, no.

23          MR. FURMAN:  We have not.

24          MR. SIRIGNANO:  In terms of severance, we've

25  indicated that it doesn't make sense to sever the case in

1    light of the practicalities of what's taken place.

2              MR. FURMAN:  Your Honor, this is the first I've

3    heard that the other answering defendant is in settlement

4    negotiations, which we don't know whether that will be of

5    fruition or not.  And I may add, that we have no motions for

6    the default and even if we did, I mean they'd have a year to

7    open those up, so --

8              THE COURT:  Well, how practically does it affect you

9    to be named with these other people, how practically are you

10   affected?

11             MR. FURMAN:  Well, if there are other co-defendants

12   who are active?

13             THE COURT:  Yes.

14             MR. FURMAN:  Well, as a practical matter, one, I'm

15   going to have to sit through discovery with them.  They have

16   the right to come to my depositions, I'll have the right to go

17   to theirs.

18             Number two, any discovery disputes will -- or

19   rulings will necessarily effect S&R and Davidov and in

20   general, in terms of judicial economy, the only economy in

21   this case is GEICO, it's GEICO's economy, so they get to do

22   two at once or three at once or four at once.  But regardless

23   of how -- and then, thirdly, if I made add, at trial -- and

24   I'm really discussing pretrial, but at trial number one,

25   somebody unrelated may be sitting next to me if we get to

GEORGETTE K. BETTS, RPR, CSR, OCR

1    trial and that is prejudicial.

2            And secondly, I have a complaint in this case that

3    has the -- number one, not clear allegations about a so-called

4    network, and naming all these other defendants.  Well, how

5    does that look for me?  When I should really be by myself in

6    this case.

7            And I'm happy to go on further if I may, but in

8    terms of answering your questions, your last question rather,

9    that is what I have to say.

10           I would like to be heard on the issue that counsel

11   has raised regarding paragraph 176, which --

12           THE COURT:  Okay.

13           MR. FURMAN:  The significance of this case and the

14   reason that we have moved is because, unlike every other case

15   virtually so far as I know that GEICO has brought in this

16   court, and there are a plethora of them, this case one by one

17   attacks each and every billing service that this defendant and

18   these defendants have done and they said that they are

19   identical and thereby fraudulent.  Well, first of all -- and

20   we've talked about this at the pretrial -- pre-motion

21   conference, there's no allegation of a concerted action here,

22   and there really can't be.  And the response of, well, we have

23   the identical billing is maybe a common question of law or

24   fact, but it is not an allegation that the federal courts have

25   relied on in terms of having sufficient reasons for joinder.

1          Now on the EMGs I'd like to point out a couple of

2     things.  One is that, although in 176 there are a number of

3     purported matches amongst co-defendants, there are only two

4     that are alleged with regard to S&R, that's two out of 28.

5     And, secondly, they are not -- by the allegation they are not

6     identical.  There are some identical matches, but --

7          THE COURT:  What do you mean they say they're

8     identical, don't they?  They say exact matches is the word

9     they use.

10         MR. FURMAN:  They're not.

11         THE COURT:  What do you mean they're not?  I have to

12    take the allegations as true.  If you want to prove they're

13    not in discovery that's one thing, but it says they're exact

14    matches.

15         MR. FURMAN:  I'm not certain -- they say they're

16    exact matches for the left peroneal motor and right and left

17    tibial motor nerve and F-wave data and wave forms.  Now there

18    are other nerves that are tested in an EMG, so -- and to be

19    more precise, I think that there have been other cases in this

20    court where there were exact matches nerve by nerve.  That's

21    not what's alleged here.  And these are the two examples that

22    they've chosen.

23         If I may also add that if this is the only

24    allegation in this complaint that has, number one, some

25    specifics, although they don't tell us the names of the

1   patients, that's not a RICO case.  At best, that would be a

2   garden variety fraud case, and with two instances, I

3   respectfully submit that that is not --

4           THE COURT:  Well, no, it's not two incidents.

5   Attached to the complaint I think they list it by defendant,

6   if I'm correct.  S&R Medical, a representative sample of

7   fraudulent filings they've got 39 fraudulent filings by S&R

8   Medical.

9           MR. SIRIGNANO:  Your Honor --

10          THE COURT:  So that's enough to have the pattern of

11  RICO.

12          MR. SIRIGNANO:  Your Honor, I don't want to just get

13  lost only on the wave match portion of the allegation.  The

14  court should be aware that the complaint sets forth in detail

15  an extreme number claim by claim of treatment and billing

16  fraud involving all of the different modalities that were

17  allegedly performed.

18          THE COURT:  I know you detail in a lot of different

19  ways how these are fraudulent and what the scheme is.  What's

20  your pattern of racketeering.  Where do you --

21          MR. SIRIGNANO:  The pattern is the mail fraud on

22  each individual bill that was mailed with all of these knowing

23  misrepresentations.

24          THE COURT:  The problem is you just have a blanket

25  statement, "the defendants."  Are you saying that everyone

GEORGETTE K. BETTS, RPR, CSR, OCR

1   named as defendant did everything named in every paragraph?

2          MR. SIRIGNANO:  Well, in certain paragraphs, for

3   example, we've identified those providers that performed the

4   range of motion testing.

5          THE COURT:  Right.  You do range of motion testing.

6          MR. SIRIGNANO:  Separately, but the other

7   providers -- that's the issue -- did identically the same

8   treatment and billing.  So, yes, all of these providers are

9   involved in the same exact treatment and billing fraud scam

10  involving the misrepresentations that we've identified by

11  service by service here.  Specific misrepresentations.  This

12  is identical fraud.

13         THE COURT:  So every time you use the term

14  "defendants" in here you are referring to S&R and to Yvette

15  Davidov.

16         MR. SIRIGNANO:  Yes.

17         THE COURT:  Every general allocation, the defendants

18  did not provide their initial examination, the defendants did

19  this, the defendants did that, all of those refer to --

20         MR. SIRIGNANO:  S&R Medical.

21         THE COURT:  -- S&R Medical.

22         MR. SIRIGNANO:  Yes, they allegedly performed and

23  billed for each of these services.

24         THE COURT:  And then in the back of the complaint

25  you allege a lot of false claims but you don't say how they're

1  false.

2           MR. SIRIGNANO:  We say how they're false in the

3  complaint, there's about 30 or 40 pages --

4           THE COURT:  Well I know --

5           MR. SIRIGNANO:  -- and then --

6           THE COURT:  -- but do each of these claims that you

7  identify all have the same type of fraudulent --

8           MR. SIRIGNANO:  Correct.

9           THE COURT:  What's fraudulent?  You say a lot of

10  different fraudulent things.

11           MR. SIRIGNANO:  What's fraudulent --

12           THE COURT:  These claims couldn't have every single

13  indicia of fraud, right?

14           MR. SIRIGNANO:  They do.  They're repetitive,

15  they're fraudulent and over and over again --

16           THE COURT:  No, but why are they fraudulent, is the

17  question.

18           MR. SIRIGNANO:  Well, the chart that's annexed as

19  Exhibit 7 shows you by claim number and the bill, each date of

20  service is a particular bill and there are CPT codes attached,

21  which are the date of service.

22           THE COURT:  The CPT codes that are referred to in

23  the complaint?

24           MR. SIRIGNANO:  Identify -- yes, those are connected

25  to the allegations in the complaint.  And you can compare --

1          THE COURT:  So 95831 is referred to where in the

2     complaint?

3          MR. SIRIGNANO:  That's a range of motion code, Your

4     Honor.  So that would relate back to the range of motion.

5          THE COURT:  Do you say in the complaint it's the

6     range -- where do you say in the complaint -- these are all

7     range of motion then claims, right?

8          MR. SIRIGNANO:  Yes.  When you go through the

9     allegations regarding the treatment fraud, which begins on,

10    for example -- if you want to go to the range motion that is

11    on page 26.

12         THE COURT:  So all of these false claims deal with

13    the range of motion?

14         MR. SIRIGNANO:  No, not all of them.  There's

15    different CPT codes next to each of the claims.  So the range

16    of motion codes are discussed in the section on page 28.

17         THE COURT:  No, it's all the same CPT.  How many

18    pages of the exhibit are there?

19         THE LAW CLERK:  Over 300.

20         THE COURT:  Relating to S&R --

21         MR. SIRIGNANO:  Yes.

22         THE COURT:  -- or others?

23         Do you want to say anything else, counsel?

24         MR. FURMAN:  I do have a couple of comments, if I

25    may, Your Honor.

1    It sounds to me at this point that we sort of jumped

2    to the specificity of the 9B issue.

3    THE COURT:  Yes, I'm sorry.

4    MR. FURMAN:  I do have a couple of comments about

5    what is discussed.  First of all, stepping back a second, as

6    far as the defendants being categorized, and I've raised this

7    in my memo in footnote 2, all of the people that they talk --

8    they say are ROM defendants are all the defendants.  So I

9    think it's a little disingenuous, if I may, to then say well,

10    that's the category because it's the same amount of

11    defendants.

12    THE COURT:  I'm not sure I understand what you're

13    saying.

14    MR. FURMAN:  Well, they say that certain defendants

15    have been denominated, and distinctively the range of motion

16    defendants, but when you actually look at the list of the

17    defendants, it's all of the defendants or all of the defendant

18    PCs and all the defendants.

19    MR. SIRIGNANO:  There's one defendant that did not

20    provide range of motion testing.

21    MR. FURMAN:  It's owned by the same defendant that's

22    already alleged.

23    THE COURT:  So what's the point?

24    MR. FURMAN:  The point is that there's -- the

25    complaint suggests that there is a differentiation when in

GEORGETTE K. BETTS, RPR, CSR, OCR

1  fact there isn't.  I'm not going to spend more time on it.  I

2  have mentioned it on my memo of law.

3          Now, if I may, two more things:  One is as far as

4  the other 9B issue, and I raised this also in my memo of law,

5  this chart really is missing a great deal of information.  And

6  it's almost, for us, worthless because it does not, if you

7  will, it doesn't include the patient name, it doesn't include

8  the date of the accident, it doesn't include the length of the

9  patient's treatment, it doesn't include the amount that was

10 paid and it doesn't state whether --

11         THE COURT:  What difference does the amount that was

12 paid mean?

13         MR. FURMAN:  Well, that would -- they have

14 allegations of a substantial amount --

15         MR. SIRIGNANO:  We've summarized that.

16         MR. FURMAN:  -- totally that was paid.

17         THE COURT:  I know but their complaint doesn't have

18 to have information in it that adds up to their damage figure.

19         MR. FURMAN:  Very well.  Then, most importantly, it

20 doesn't state what the fraud is.  And in the complaint they

21 make allegations that in some unknown instances services

22 weren't even rendered.  Now that's different than saying the

23 services weren't medically necessary or the services were

24 up-coded.  We can't tell from this complaint which is which.

25         THE COURT:  Well that's what discovery is about.

GEORGETTE K. BETTS, RPR, CSR, OCR

1          MR. FURMAN:  Finally, if I may, and this is probably

2     the most significant example, they allege that all of the

3     physical therapy that was performed by this PC over a six-year

4     period is fraudulent and the reason that they say that is

5     because they, in essence, say all of these patients weren't

6     really injured.  That's quite a generalization.  That's their

7     theory of this case.  And we suggest that there isn't a backup

8     for this and it is not plausible.  You're talking about every

9     patient.  You mean to tell me that everybody --

10          THE COURT:  They may allege that but if not every

11     single patient was a fraud, that wouldn't mean they don't have

12     a RICO case.  They may allege that, that's an allegation you

13     believe they can't support, but if a substantial portion of

14     patients didn't receive the appropriate treatment, that would

15     be sufficient.  You're just saying that you don't think they

16     can back up that particular claim.

17          MR. FURMAN:  Well, the reason they keep saying it is

18     because they say basically it's part of one great conspiracy

19     where there are all of these doctors' offices are somehow

20     interrelated.  But they never have any allegations about how

21     they're interrelated other than -- and I shouldn't say other

22     than --

23          THE COURT:  That goes to your severance point and I

24     think that argument is stronger.  Could you add allegations to

25     this -- let me just ask in terms of the amended complaint, can

1    you add allegations that would strength the claim that these

2    people should all be together?

3           MR. SIRIGNANO:  Yes, Your Honor.

4           THE COURT:  From the court's point of view you may

5    be cheating us out of a filing fee.

6           MR. SIRIGNANO:  Your Honor, to some extent there

7    have been a number of these cases filed because insurance law

8    has a requirement that insurance companies have to actively

9    investigate and prosecute insurance fraud.  So GEICO, like

10   other carriers, has an obligation to go after insurance fraud.

11   Yet in an effort to try --

12          THE COURT:  What does that mean, that you named

13   disparate people in one complaint because you have an

14   obligation?

15          MR. SIRIGNANO:  No, to some extent --

16          THE COURT:  The thing is you haven't named them.  It

17   would be a little more persuasive if they had all been named

18   as one RICO organization, but what you've done is you have

19   named them independent, which is probably correct, by the way.

20   You've named them as independent RICO claims, it's a RICO

21   claim against every one of them and then you've indicated a

22   lot of similar conduct.  But I have a question about whether

23   they should all be joined together or simply on the

24   allegations that you have.

25          MR. SIRIGNANO:  Well, I think certain other judges

GEORGETTE K. BETTS, RPR, CSR, OCR

1    have found under similar allegations that based on judicial

2    economy, at least at this stage, that it makes sense to join

3    them together because of the identical nature.  I mean

4    Mr. Furman's complained about all the defendants being lumped

5    together, that's the reason, because this is all identical

6    fraud.  And as we have alleged, we've alleged that they draw

7    from a common stock of phony data.  There's evidence of that.

8    Not every single EMG/NCV test we can prove at this juncture,

9    well we have a good faith basis to believe and we alleged that

10   there was a common source of data.

11          In addition, we expect through discovery to make

12   clear, which we have a very good belief, that the two doctors

13   that primarily worked for S&R Medical, the treating

14   neurologists who were performing these EMG/NCV tests --

15          THE COURT:  Who is that?

16          MR. SIRIGNANO:  Dr. Surlin and Dr. Kim.  The owner

17   is not performing the EMG/NCV tests for the most part we

18   believe.  They hire, as independent contractors, certain

19   neurologists.  Those neurologists work for all of these

20   professional corporations, or most of them -- actually all of

21   them we believe and that's --

22          THE COURT:  Who hires the neurologist?

23          MR. SIRIGNANO:  Well, we believe it's laypersons,

24   but based on what's supposed to happen is the nominal owner of

25   this professional corporation is supposed to hire the

1    neurologist, but you find commonalities that for some reason

2    the same two treating neurologists working for S&R Medical are

3    working for LifeSpan Medical, or working for Lifex Medical.

4    Going to different locations, all pulling from the same stock

5    of fraudulent data.

6              So from our perspective, when you couple that with

7    the absolute identical nature of the individual treatment

8    frauds for each of the treatment modalities --

9              THE COURT:  Tell me something that's unique about

10   this fraud.  What unique thing do you say they're all using

11   something, but what would be unique about it?

12             MR. SIRIGNANO:  What would be unique about it is

13   they are all using the same two treating neurologists who are

14   pulling from this stock of data.

15             THE COURT:  So every one of these clinics use the

16   same treating neurologist, you don't allege that.

17             MR. SIRIGNANO:  They do use -- occasionally use

18   others from our understanding.

19             THE COURT:  Do you allege that somewhere in your

20   complaint?

21             MR. SIRIGNANO:  It's not alleged in the complaint,

22   no, Your Honor, we expect that to be proven through discovery.

23             THE COURT:  Do you know that now, could you allege

24   that?

25             MR. SIRIGNANO:  We can allege that.

                    GEORGETTE K. BETTS, RPR, CSR, OCR

1          THE COURT:  That they all use the same treating

2   neurologists.

3          MR. SIRIGNANO:  That the two primary treating

4   neurologists working for S&R Medical also provided services

5   for each of the others.  Now --

6          THE COURT:  Do they work at these clinics?  Where do

7   these people work?

8          MR. SIRIGNANO:  That's a good question.  We believe

9   they show up sporadically at each of the clinics not

10  necessarily called by the actual doctor.

11         THE COURT:  What are they doing in the scheme?

12         MR. SIRIGNANO:  What are they doing?  They're

13  supposedly meeting with the patient and then making a medical

14  determination whether or not a EMG/NCV test is necessary and

15  then performing at least the EMG portion of it.  A technician

16  generally performs --

17         THE COURT:  So how are they related to Dr. Davidov?

18         MR. SIRIGNANO:  They are then -- that treatment,

19  that service that has been performed at a clinic somehow gets

20  billed under Dr. Davidov's professional corporation to GEICO.

21  And I would bet through discovery we're going to find that

22  those doctors at that clinic probably on a different day those

23  services get billed to another professional corporation.

24         THE COURT:  So you can add that to your complaint,

25  all right.

1    MR. SIRIGNANO:  We can add that the two doctors, as

2  I said, provide services, some of the services for all of

3  these.  There are common links between all the providers.

4    I think through discovery we're going to find more

5  common links and in light of the fact that we have so few

6  defendants left, we would suggest that if severance is going

7  to be considered, at least let some minimum discovery proceed

8  and if Mr. Furman and the discovery shows that there's

9  absolutely no link between these, certainly let him renew his

10  motion for severance.  But at this juncture the discovery that

11  GEICO is going to serve -- Mr. Furman knows this, he's been

12  involved in lots of these cases -- is virtually identical to

13  each of the defendants.

14    As we've seen here, and as we continue to repeat,

15  the treatments are identical.  The scams are identical, the

16  kickbacks are identical.  Everything about the fraud is

17  identical, so there's common questions of fact and law and in

18  addition to judicial economy it just seems to make sense to

19  handle this, at least at the discovery stage, in a single

20  action.  If something develops where it's proven these are

21  unrelated, I think then we can revisit, but we do have enough

22  in terms of an allegation that they drew from a common stock

23  of data coupled with the other factors that I mentioned.

24    We believe it made it sensible for GEICO to bring

25  this case in one suit.  The alternative would be to bring four

GEORGETTE K. BETTS, RPR, CSR, OCR

1   or five or six different suits which, frankly, I might be here

2   in a little different fashion, the court may not appreciate us

3   bringing separate suits when ultimately we believe it will

4   turn out that this is a common scheme involving identical

5   treatments, identical billings.

6        THE COURT:  On the current state of the record I'm

7   going to deny both motions and let the case go forward.  I

8   think the allegations are sufficient based on what's been

9   argued here today.  There's a general outline of the scheme

10  and the pattern of racketeering is the mailing, the

11  racketeering acts are detailed and the fraudulent claims are

12  detailed by number and code number, the code numbers relate to

13  allegations of fraud in the indictment.  I'm going to let it

14  go forward.

15       For now I'll let the case go forward together but,

16  again, this is something that can be revisited and obviously I

17  don't think we're going to get to any position where anybody

18  is going to be tried.  But if we come to a trial, then we can

19  talk about why they should be severed at that point in time.

20  If you want to argue that discovery hasn't shown the link and

21  this is prejudicial that could well be the case, but I'm not

22  going to do the severance now.

23       So have you met with the magistrate?

24       MR. FURMAN:  We have a date.

25       MR. GOLDBERG:  The initial conference is scheduled

```
1    for February 26th.

2                THE COURT:  Then you can do your schedule then.

3                When are you gentlemen going to get around talking

4    settlement since you talked settlement with the other folks?

5                MR. SIRIGNANO:  GEICO is always open to discussing

6    settlement.  The defendants --

7                MR. FURMAN:  I mean I think it depends --

8                THE COURT:  Can we go off the record if we discuss

9    settlement, I take it you prefer we do that, both sides?

10               MR. SIRIGNANO:  Yes.

11               MR. FURMAN:  Yes.

12               THE COURT:  We'll go off the record.

13               (Off the record.)

14               THE COURT:  Thank you, Gentlemen.

15               (Matter concluded.)

16

17                    *     *     *     *     *

18

19   I certify that the foregoing is a correct transcript from the
     record of proceedings in the above-entitled matter.
20

21        /s/ Georgette K. Betts            February 10th, 2016

22        GEORGETTE K. BETTS                DATE

23

24

25
```

GEORGETTE K. BETTS, RPR, CSR, OCR